In the Matter of the Petition of UNIVERSITY HOSPITALS AUTHORITY, an agency of the State of Oklahoma and University Hospitals Trust, a public trust.

No. 90212.

Supreme Court of Oklahoma.

Dec. 30, 1997.

Opinion Concurring on Denial of Rehearing Jan. 29, 1998.

.

N. Martin Stringer, Phillip L. Savage, George D. Davis, Mary E. Nelson, McKinney, Stringer & Webster, P.C., Oklahoma City, for Petitioners.

Jon D. Sellers, for Protestants Common Cause Oklahoma, N.A.A.C.P., Oklahoma City Branch, and Oklahoma Coalition for Health Security.

John B. Heatly, Fellers, Snider, Blankenship, Bailey & Tippens, P.C., Oklahoma City, for HCA Health Services of Oklahoma, Inc.

Fannie Bates, pro se, Protestant.

James Behrman, M.D., Edwin Kessler, and Roosevelt Milton, pro se, Protestants.

Mark Seikel, Member House of Representatives, pro se, Protestant.

Cindy Tate, Friday's Home Health Services, Inc., pro se, Protestant.

Nancy Stewart, pro se, Protestant.

John L. Lucas, M.D., Saint Francis Health System, Inc., Tulsa, pro se, Protestant.

Mary Alice Valentine, Director, The Rejuvenation and Longevity Foundation, Inc., pro se, Proponent.

Howard Turney, pro se, Proponent.

WATT, Justice:

### FACTS AND PROCEDURAL BACKGROUND

¶1 This is an original action brought by petitioners University Hospitals Authority and University Hospitals Trust seeking approval by this Court of a lease of the University Hospitals from University Hospitals Trust to HCA Health Services of Oklahoma, d/b/a Presbyterian Hospitals[1] pursuant to process issued in conformance with § 3225 of the Act, which is set out in full in note 3.

¶2 In 1993 the Legislature transferred "jurisdiction, supervision, management and control" of the University Hospitals from the Department of Human Services to the Authority. 63 O.S.Supp.1993 § 3204. Section 3204 is a part of the University Hospitals Authority Act, 63 O.S.Supp.1993 §§ 3201, et seq. The Legislature amended the Act in 1997 to authorize the creation of a public trust to be called the University Hospitals Trust. 63 O.S.Supp.1997 § 3224.[2] The

---

1. The University Hospitals include University Hospital, Children's' Hospital of Oklahoma, the Child Study Center, and the O'Donoghue Rehabilitation Institute, all located in Oklahoma City.

2. 63 O.S.Supp. § 3224 provides:
   A. The State of Oklahoma expressly approves the creation of a public trust to be denominated the "University Hospitals Trust", of which the State of Oklahoma shall be the beneficiary, provided such approval shall be contingent upon the following conditions being satisfied:
   1. Finalizing of the Declaration of Trust;

2. Adoption of the Declaration of Trust by an official action of the trustees of the Trust;
   3. Submission of the Trust for acceptance of the beneficial interest and approval as required by Section 177 of Title 60 of the Oklahoma Statutes; and
   4. The approved Declaration of Trust shall:
      a. clearly state that the principal purpose of the University Hospitals Trust is to effectuate the purposes of the University Hospitals Authority as established in the University Hospitals Authority Act,

Trust, the Authority, and HCA, together with the Board or Regents of the University of Oklahoma, agreed to the lease of the University Hospitals to HCA, called the "Transaction" by the parties. The Transaction is memorialized in an agreement called the "Closing Agreement," which includes by reference several earlier agreements.

b. except as otherwise provided by law, provide that the fee simple title to real property held by the University Hospitals Authority shall not be transferred, conveyed, or assigned to the University Hospitals Trust without the express consent of the Legislature as the governing entity of the beneficiary pursuant to Section 176 of Title 60 of the Oklahoma Statutes,

c. provide that any indebtedness incurred by the University Hospitals Trust or the trustees of the Trust shall not be secured with or create a lien upon real property to which title is held by the University Hospitals Authority and shall not involve the bonding capacity of the University Hospitals Authority,

d. provide that the trust estate of the University Hospitals Trust shall not include fee simple title to real property owned by the University Hospitals Authority,

e. clearly state that the creation of the University Hospitals Trust shall not in any way reduce, limit or interfere with the power granted to the University Hospitals Authority in the University Hospitals Authority Act,

f. provide that any lease or contractual agreement involving use of the real property to which title is held by the University Hospitals Authority and any improvements thereto shall contain a provision and covenants requiring the proper maintenance and upkeep of the real property and improvements,

g. provide that the trustees of the University Hospitals Trust shall be the acting members of the University Hospitals Authority as provided in the University Hospitals Authority Act, and

h. provide that the trustees of the University Hospitals Trust shall have the duty to submit an annual report to the Governor, the President Pro Tempore of the Senate, the Speaker of the House of Representatives and members of the Task Force created by subsection D of this section. The report shall be submitted by January 1 of each year and shall include an account of all operations, actions of the Trust, account of all revenue received and disbursed by the Trust for the previous fiscal year. The report shall also provide a complete accounting of how the Trust meets its primary function of effectuating the purposes of the University Hospitals Authority, as established in the University Hospitals Authority Act. The Trust shall meet with the Task Force created in subsection D of this section to review the contents of the annual report.

B. The University Hospitals Trust shall require any agreements which it enters into with any entity pursuant to Section 3226 of this title for the operations of facilities leased by the University Hospitals Authority to the Trust to include, but not be limited to:

1. The inclusion of four of the five members of the Trust as four of the five members representing the State of Oklahoma as state appointees to the governing committee created pursuant to a proposed agreement;

2. Binding arbitration shall not be involved in such agreements for resolving issues under consideration by the governing committee; and

3. Major decisions shall be resolved by the governing committee, and approval of any major decision by the governing committee must include the approval of a majority of the state appointees and the approval of a majority of the members of the private entity appointees to the governing committee. Major decisions shall include:

a. approval of the annual operating and capital budgets,

b. sale or disposition of assets that individually have a fair market value over Two Hundred Fifty Thousand Dollars ($250,000.00),

c. the termination or transfer or material addition or material diminution of medical services at the Oklahoma Medical Center related to and part of a teaching program of the University of Oklahoma Health Sciences Center, and

d. other major decisions as may be agreed upon by the Trust and the private entity.

C. To the extent it is determined by legislative enactment that the Trust has expended funds in contravention of its mission as set forth in this section, the Trust shall remit, upon thirty (30) days' written notice from the University Hospitals Authority, such sum or sums to the University Hospitals Authority.

D. There is hereby created the "University Hospitals Trust Legislative Advisory Task Force".

1. The Speaker of the House of Representatives and the President Pro Tempore of the Senate shall each appoint three legislators from their respective legislative bodies, provided that they shall each appoint one member from the minority party.

2. The chair and vice-chair position shall rotate between the House of Representatives and Senate, provided that the Speaker shall appoint the initial chair whose term shall expire on the first day of the First Regular Session of the Forty-sixth Oklahoma Legislature. The chair and vice-chair shall rotate on the first day of the first regular sessions of subsequent legislatures.

3. Members of the Task Force shall be reimbursed by their respective legislative bodies for necessary duties related to the Task Force pursuant to Section 456 of Title 74 of the Oklahoma Statutes.

4. The purpose of the Task Force is to provide a means of communication between the Legislature and the University Hospitals Trust. The Trust shall invite members to attend meetings of the Trust. Task Force members shall be able to

¶ 3 Under the terms of the Act the Legislature made a public policy determination that the needs of Oklahoma citizens would be best served if the Authority were "charged with the mission of operating or *leasing*" the hospitals. [Emphasis added.] 63 O.S.Supp. 1997 § 3203.B.

¶ 4 The Act requires that before any "proposed agreement regarding the lease and operations of the University Hospitals" could become effective, it would have to be approved by the Contingency Review Board, and by this Court. 63 O.S.Supp. § 3225.[3] The members of the Contingency Review Board are the Governor, the Speaker of the House of Representatives, the President Pro Tem of the Senate, and the Director of State Finance, who is an *ex officio* non voting member. 74 O.S.Supp.1992 § 3605. The

Contingency Review Board approved the Transaction.

¶ 5 If this Court is "satisfied that the proposed agreement is in accordance with the ... Act and Oklahoma Laws" the Act states that we shall "enter a declaratory judgment approving and declaring the proposed agreement to be valid," and "permanently [enjoin] all persons described in the notice [of the application filed in the Supreme Court] ... from ... instituting any action or proceeding contesting the validity of the proposed agreement." 63 O.S.Supp.1997 § 3225.B.3.

¶ 6 No contention is made that the Act violates this Court's proscription against issuing advisory opinions, established in *Application of Fun Country Development Authority,* 1977 OK 138, 566 P.2d 1167, and we

---

participate in discussions of the Trust in an advisory capacity.

3. 63 O.S.Supp.1997 § 3225 provides:

A. Contingent upon the creation of the University Hospitals Trust as provided in Section 3224 of this title, the Trust, prior to acceptance, shall submit to the Contingency Review Board for review the proposed agreement regarding the lease and operations of the University Hospitals to any entity authorized to transact business in the state and an independent statement as to the fairness of said proposed agreement for the State of Oklahoma. The Contingency Review Board shall upon receipt of the proposed agreement meet within fifteen (15) business days to review the proposed agreement; and unless the Contingency Review Board disapproves the proposed agreement, the proposed agreement may be executed, but no lease of the University Hospitals shall become effective until after Supreme Court approval pursuant to subsection B of this section.
B. 1. If a proposed agreement is not disapproved by the Contingency Review Board pursuant to subsection A of this section, the University Hospitals Authority and University Hospitals Trust, within thirty (30) calendar days after the time for Contingency Review Board action has expired, may file a petition with the Supreme Court of Oklahoma for a declaratory judgment determining the validity of the proposed agreement. The review of the Court shall be based upon the exercise of any of the powers, rights, privileges, and functions conferred upon the Authority or the University Hospitals Trust, as applicable, under the University Hospitals Authority Act and Oklahoma laws. Exclusive original jurisdiction is conferred upon the Supreme Court to hear and determine such petitions. The Supreme Court shall give such petitions precedence

over other business of the Court except habeas corpus proceedings.
2. Notice of the hearing of such a petition shall be given by a notice published in a newspaper of general circulation in this state that on a day specified the Supreme Court will hear the petition to approve the proposed agreement and enter a declaratory judgment. The notice shall be published one time not less than ten (10) days prior to the date specified for the hearing. The notice shall inform property owners, taxpayers, citizens, and all persons having or claiming any right, title, or interest in the proposed agreement or properties or funds to be affected by the implementation of the proposed agreement, or affected in any way thereby, that they may file protests against the approval of the proposed agreement, and be present at the hearing to contest the legality of the proposed agreement. The hearing may be adjourned from time to time at the discretion of the Court.
3. If the Court is satisfied that the proposed agreement is in accordance with the University Hospitals Authority Act and Oklahoma laws, the Court shall enter a declaratory judgment approving and declaring the proposed agreement to be valid and conclusive as to the Authority, the Trust, and all other parties to the proposed agreement; and, upon petition of the Authority, shall issue an order permanently enjoining all persons described in the notice required by this subsection from thereafter instituting any action or proceeding contesting the validity of the proposed agreement. A declaratory judgment rendered pursuant to this subsection shall have the force and effect of a final judgment or decree and shall be incontestable in any court in this state.
4. As used in the University Hospitals Authority Act, "proposed agreement" means one or more contracts regarding the lease and operations of the University Hospitals and all other agreements

hold that it does not do so because the Act called for notice and gave all protestants the opportunity to be heard. Thus, there is before us an actual case or controversy, and our decision today is not advisory. Further, because of the importance to the public of settling the issue of the lawfulness of the Transaction, we hold that the Act appropriately invoked this Court's jurisdiction. *Application of Goodwin*, 1979 OK 106 ¶ 2, 597 P.2d 762.[4]

## THE TRANSACTION

¶ 7 The Transaction involves a long term lease and transfer of the University Hospitals properties and other non-cash assets from the Authority to the Trust. The Trust agrees in a sublease and contract to transfer to HCA the right to use those assets and operate the Hospitals. A Joint Operating Agreement provides how the University Hospitals and HCA's Presbyterian Hospital are to be operated. The Trust retains all duties imposed upon it under the Act. The day-to-day management and operation of the Hospitals is left to HCA. Certain major decisions, however, are reserved for decision by a Governing Committee created by the Act. At closing, HCA is to pay the Trust $19,200,-000.00, and the University of Oklahoma $10,-000,000.00. HCA is to deposit $10,800,000.00 in an interest bearing escrow account, and pay from it to the University four annual installments of $2,700,000.00 each. In return, all revenues from the operation of the Hospitals will be owned exclusively by HCA but HCA is to pay up to $9,000,000.00 per year of the Hospitals' earnings plus 30% of all pre-tax earnings of the Hospitals over $39,000,000.00. The Agreement expressly states that it does not create a partnership, joint venture, or agency relationship between the Trust and HCA.

contemplated by or referred to in the contract regarding such lease and operations.

4. "Whenever widespread interest may demand an immediate resolution of some vital public law issue, no impediment arising from infirmity in the procedural posture of the case—however well recognized in purely private litigation—will bar our exercise of reviewing powers." *Goodwin*, 1979 OK 106 ¶ 2, 597 P.2d 762, 764.

¶ 8 In a separate "Indigent Care Agreement" HCA has agreed with the Authority to provide indigent care at all HCA hospitals. HCA agrees to provide care at costs defined in the Agreement in return for the Authority's promise to pay to HCA the amounts appropriated for indigent care by the Legislature.

¶ 9 The Regents and HCA have agreed that HCA will continue to allow students and faculty at the University of Oklahoma Health Sciences Center to use the University Hospitals, and the University of Oklahoma will continue to use the University Hospitals as its primary teaching hospitals. HCA also agrees to use its best efforts to provide patients under managed care agreements for treatment to the Hospitals, and to pay to the University monthly compensation specified in the agreement for the services provided.

¶ 10 The only Protestants who responded to the Notice of this proceeding within the time allowed by the Notice and by the order of this Court of October 13, 1997 that all protests were to be filed not later than November 3, 1997 and are represented by counsel are Common Cause Oklahoma, the N.A.A.C.P., Oklahoma Branch, and the Oklahoma Coalition for Health Security. Their counsel candidly concedes that this Court has jurisdiction under the Act, and that the parties to the Transaction complied with the requirements of the Act.[5]

## DISCUSSION

*The Standard of Review*

¶ 11 Protestants have raised several public policy issues, some of which are that the Transaction will cause staff reductions at the University Hospitals, that HCA should not be allowed to lease and operate the hospitals because it is a large private corporation, that the Transaction will put competing

5. On November 19, 1997 counsel for these Protestants filed an application on behalf of another protestant, Gail L. Offerman, M.D. to file a brief on behalf of Dr. Offerman. We denied Dr. Offerman's application because (1) it was filed out of time, in violation of our October 13, 1997 order that all protests be filed no later than November 3, 1997, and (2) Dr. Offerman's contentions were raised by other Protestants and are addressed in this opinion.

hospitals out of business, that the costs of health care will rise, and that HCA will gain control over medical education in Oklahoma. In addition, some Protestants raise an ethical issue, claiming that the President *pro tem* of the Senate and the Governor, both members of the Contingency Review Board, have an unethical and unlawful conflict of interest because of their relationship with HCA and that we should, therefore, declare the Transaction unlawful. The public policy issues are within the purview of the Oklahoma Legislature, and the ethics issue, if any, should initially lie within the province of the Ethics Commission and the Legislature. These issues are, therefore, not available to this Court as reasons to declare the Transaction unlawful. In *Application of Oklahoma Capitol Improvement Authority*, 1960 OK 207, 355 P.2d 1028, 1031, we said:

> In construing the constitutionality of a statute the Supreme Court is not authorized to consider its propriety, wisdom, or its practicability as a working proposition. Those questions are clearly and definitely established by our fundamental law to a certainty as functions of the legislative department of the government. . . . There is a presumption that the act is constitutional. . . . Courts must sustain statutes, if possible, and nullify them only when they are clearly unconstitutional.

A determination of the validity of the claimed ethics violations is constitutionally vested with the Ethics Commission. This Court does not exercise power that is constitutionally granted to another entity. Okla. Const. Art. IV § 1; *State v. Freeman*, 1968 OK 54 ¶¶ 35–43, 440 P.2d 744, 753–54. Thus, the public policy and ethics issues listed above are beyond our purview here and we must limit our review to whether the Act violates other laws or is unconstitutional. We expressly refuse to pass on the wisdom and business advisability of the Transaction, or the lack thereof. Here, we conclude that the Transaction is not in discord with the requirements of the Act and other Oklahoma law.

¶ 12 Protestants raise two issues into which we shall inquire: (1) Did Petitioners violate the Open Meeting Act, 25 O.S.1991

§§ 301, et seq., and the Open Records Act, 51 O.S.Supp.1997 §§ 24A.1, et seq.; and (2) Does the Transaction violate Okla. Const. Art. 10 § 15. For the reasons discussed below, we declare that neither the Open Meeting Act, the Open Records Act nor Okla. Const., Art. 10 § 15, was violated.

*The Transaction Violates Neither the Open Meeting Act nor the Open Records Act*

■ ¶ 13 Title 63 O.S.Supp.1997 § 3207.I expressly provides that the Authority is subject to the Open Meeting Act, 25 O.S.1991 §§ 301, et seq., and to the Open Records Act, 51 O.S.Supp.1997 §§ 24A.1, et seq. Nevertheless, we find no violation of either act here.

¶ 14 The obligation imposed on public bodies to hold open meetings and to give notice of such meetings is set out in 25 O.S.1991 § 303 of the Open Meeting Act, which provides in relevant part as follows:

> All meetings of public bodies . . . shall be held at specified times and places . . . and shall be open to the public. . . . All meetings of such public bodies . . . shall be preceded by advance public notice. . . .

¶ 15 Title 51 O.S.1991 § 24A.2 of the Open Records Act declares that Oklahoma's public policy and the purpose of the Act is to "ensure and facilitate the public's right of access to and review of government records. . . ." Section 24A.3 of the Open Records Act defines the term "Record" as "all documents [used] in connection with the transaction of public business. . . ."

¶ 16 Protestants do not claim that they were not given notice of the meetings, or notice of the fact that the agreement with HCA was under consideration. In fact, some or all of the Protestants attended the Authority meeting at which the Closing Agreement was approved. Protestants claim, however, that the Open Meeting Act and Open Records Act were violated because copies of the contract were not made available to them until two days before the Meeting of the authority at which the contract was approved. The Authority observes, without contradiction, that the contract was not completed until two days before the meeting, at which time it was made available to Protes-

tants. Thus, the "record" demanded by Protestants was made available to them as soon as it came into existence. The Authority, therefore, violated neither the Open Meeting Act nor the Open Records Act.

*The Transaction Does not Violate Okla. Const., Art. 10 § 15*

■ ¶17 Protestants urge us to hold that the Transaction violates Okla. Const., Art. 10 § 15, which states in material part:

A. Except as provided by this section, the credit of the State shall not be given, pledged, or loaned to any individual, company, corporation, or association, municipality, or political subdivision of the State, nor shall the State become an owner or stockholder in, nor make donation by gift, subscription to stock, by tax, or otherwise, to any company, association, or corporation.

¶18 On December 18, 1997 Protestant, Common Cause Oklahoma, was given the opportunity to introduce evidence it contended would show that the Transaction was a gift in violation of Art. 10 § 15.[6] Both Common Cause Oklahoma and Petitioners presented evidence. The Referee before whom the hearing was held filed Findings of Fact, conclusions of law, and a Memorandum of Authorities on December 24, 1997. Among other findings, the Referee found as a fact that the Transaction allows the state to eliminate a multimillion dollar annual loss while gaining the potential to earn 1.1 billion dollars over the fifty year term of the lease of the University Hospitals. Based on the record and applicable law, the Referee concluded as a matter of law that (1) the consideration, both monetary and non-monetary, received under the terms of the Transaction prevents the Transaction from constituting a gift that violates Art 10 § 15, and (2) the Indigent Care Agreement does not violate Art 10 § 15. Common Cause Okla-

homa argues that the Transaction violates Art. 10 § 15 in the same way it was violated in *Veterans of Foreign Wars v. Childers*, 1946 OK ——, 197 Okla. 331, 171 P.2d 618. There, the legislation at issue had given state money to the VFW, and the VFW was not required to provide any services to the state but was merely directed to help veterans and their families. The Referee concluded that the Transaction was more akin to *Burkhardt v. City of Enid*, 1989 OK 45, 771 P.2d 608, and *Children's Home & Welfare Association v. Childers*, 1946 OK ——, 197 Okla. 243, 171 P.2d 613. We agree, and approve the Referee's findings and conclusions.

¶19 In *Burkhardt*, the City passed a bond issue to buy Phillips University. The City bought the property, transferred it to a public trust, and the trust then leased the school to Phillips University. The City admitted that the consideration for the transfer was less than the property's market value. Nevertheless, we rejected the contention that the transfer had been a gift in violation of Art. 10 § 17, which is the version of Art. 10 § 15 that applies to municipalities.[7] We held that the public benefits flowing to the City of Enid and the obligations assumed by Phillips University from the legislation constituted consideration sufficient to satisfy the requirements of Art. 10 § 17. *Burkhardt* ¶ 12.

¶20 *Burkhardt* applies here, and we are bound by the Legislature's express finding that benefits will accrue to Oklahoma citizens as a result of leasing the operations of the University Hospitals to a private organization. 63 O.S.Supp.1997 § 3203.B. Further, the State will realize many millions of dollars from the Transaction.

■ ¶21 Protestants argue that the Indigent Care Agreement constitutes a transfer of state money to a private organization in violation of Art. 10 § 15 because the funds

---

6. Our order, dated December 18, 1997, directed that such a hearing be held before the Referee. Other Protestants appeared at the hearing but were not allowed to participate because the purpose of the hearing was to allow Common Cause Oklahoma to present evidence in support of its contention that the Transaction violated Art. 10 § 15.

7. Art. 10 § 17 provides:

The Legislature shall not authorize any county or subdivision thereof, city, town, or incorporated district, to become a stockholder in any company, association, or corporation, or to obtain or appropriate money for, or levy any tax for, or to loan its credit to any corporation, association, or individual.

to pay HCA for those services are to come from legislative appropriations. This argument ignores the fact that the services HCA will provide under the Indigent Care Agreement are services just as are computer service contracts, and other contracts for services that are paid for with appropriated funds. We addressed virtually the same issue in *Children's Home & Welfare Association v. Childers*, 197 Okla. 243, 171 P.2d 613 (1946) where we held that a contract between the state and a children's home for the care of orphaned children did not violate Art. 10 § 15. We held that the payment of appropriated funds in return for these services was not a prohibited transfer of public funds to a private organization.

¶ 22 Counsel for Protestants concedes that each of the individual contracts comprising the Transaction is constitutional, but claims that the recitations in the Closing Agreement make the agreements as a whole unconstitutional. Because the Authority and the Trust are both parties to the Closing Agreement, Protestants apparently believe it is *ipso facto* violative of Art. 10 § 15. For the reasons discussed above, the Closing Agreement and its component contracts are constitutional.

*Relief Granted*

¶ 23 Section 3225.B.2 of the Act provides that Notice of the petition filed by Petitioners in this Court shall be given to "property owners, taxpayers, citizens, and all persons having or claiming any right title or interest in the proposed agreement or properties or funds to be affected" by the Transaction. Petitioners gave such a notice on October 13, 1997.

¶ 24 Section 3225.B.3 of the Act provides,

If the Court is satisfied that the proposed agreement is in accordance with the University Hospitals Authority Act and Oklahoma laws, the Court shall enter a declaratory judgment approving and declaring the proposed agreement to be valid and conclusive as to the Authority, the Trust, and all other parties to the proposed agreement; and, upon petition of the Authority, shall issue an order permanently enjoining all persons described in the notice required by this subsection from thereafter instituting any action or proceeding contesting the validity of the proposed agreement.

¶ 25 The materials in the record before us here show that the proposed agreement is not in discord with the University Hospitals Authority Act and Oklahoma laws. This is the only justiciable issue before us. Under Const. Art. 7 § 4 we have jurisdiction to grant the declaratory judgment and injunctive relief as called for in § 3225.B.3. We grant declaratory judgment but decline to grant injunctive relief. The Transaction's terms are to be carried out over fifty years. It is impossible to say what circumstances not evident from the record before us today might arise at some future time that would expose a critical infirmity in the Transaction. Based on the record before us, the proposed agreement is not in discord with the University Hospitals Authority Act and Oklahoma laws. Because of this conclusion, the parties to the Transaction may proceed as directed by the Act.

¶ 26 JURISDICTION ASSUMED, AND RELIEF GRANTED PER OPINION.

¶ 27 KAUGER, C.J., SUMMERS, V.C.J., and HODGES, HARGRAVE and WATT, JJ., concur.

¶ 28 OPALA and ALMA WILSON, JJ., concur in judgment.

¶ 29 LAVENDER and SIMMS, JJ., disqualified.

OPALA, Justice, with whom WILSON, Justice, joins for Parts 1, 2, 3 and 4, concurring in judgment.

Although I concur in today's judgment, I write separately to explain the critical steps that guide my analysis of this case.

(1) Judicial scrutiny of the Transaction at hand is *confined by law* to a search for infirmities recognized in the legal system. The range of policy choices and of considerations that would accommodate, or even command, managerial or economic preferences (either of short- or of long-term character) may not enter into the court's decisional

process. These concerns lie exclusively within the domain of executive or legislative action.[1]

(2) The activities that by the terms of this Transaction are to be transferred to the contracting *private entrepreneur* do not appear to fall into that inner core of strictly public functions the State is constitutionally powerless to delegate to nonpublic entities.[2]

(3) There is *no* probative basis for a legally supportable finding that this Transaction, alleged to be an agreement supported by no more than *de minimis*[3] consideration, may be condemned for being an illusory contract that should be invalidated as a *disguised gift* in violation of Art. 10, Sec. 15, Okl. Const.[4] The legal conclusion pressed on the court to declare this Transaction an impermissible donation is amply refuted by the record viewed as an entirety.

(4) "A gift may be defined as a voluntary transfer of his property by one to another *without any consideration or compensation therefor*" [Emphasis supplied].[5] **The donor must intend gratuitously to pass the title to the donee.**[6] On this record, a finding of donative intent on the part of the State would be utterly unsupportable. Consideration takes away from the Transaction its donative character.

(5) Neither facially nor by proof dehors the four corners of the document is the Transaction in contest condemnable as in discord with the applicable law.

(6) The judgment roll for this cause will not allow the court to grant injunctive relief that is contemplated by the Act. Today's declaration that the Transaction is not in discord with the applicable law provides a *complete judicial response* to the issues actually tendered, inquired into, and decided under the Act, which confers on the Supreme Court mandatory original jurisdiction of this cause.[7]

(7) Insofar as today's declaration may spawn other issues or rights not now before the court, there can be no legal impediment to future litigation over their judicial settlement.[8]

(8) Although the terms of the Act severely restrict the time frame for adduction of evidence, protestants were afforded ample opportunity *fully and fairly* to present proof of the Transaction's *extrinsic* flaws. The hearing afforded them by the court before the assigned referee meets constitutional muster when measured by the minimum standards of Due Process.[9]

(9) The referee correctly allocated to the protestant the burden of production and persuasion on protestant's allegation that the Transaction should be condemned as a disguised gift. Courts cannot assume a violation of fundamental law. Those who chal-

1. See *Application of Goodwin*, Okl., 1979 OK 106, 597 P.2d 762 (1979), where it is stated: "Courts do not concern themselves with the merits, wisdom or advisability of legislative enactments but only with their meaning and validity."

2. Sovereign power of the State is not delegable to private entities or institutions. *State ex rel. Schones v. Town of Canute*, 1993 OK 90, 858 P.2d 436, 446 n. 40 (Opala, J., dissenting), citing *People v. Chicago*, 413 Ill. 315, 109 N.E.2d 201, 206 (1952); *Veterans of Foreign Wars v. Childers*, 197 Okl. 331, 171 P.2d 618, 619 (syllabus 2 by the court) (1946).

3. *De minimis* is a contraction of the legal maxim *de minimis non curat lex*—the law takes no notice of trifling matters. Black's Law Dictionary (4th Ed.1951).

4. The pertinent terms of Art. 10, Sec. 15, Okl. Const., are: "A. Except as provided by this section, the credit of the State shall not be given, pledged, or loaned to any individual, company, corporation, or association, municipality, or political subdivision of the State, nor shall the State become an owner or stockholder in, nor make donation by gift, subscription to stock, by tax, or otherwise, to any company, association, or corporation. * * * "

5. *Childrens Home and Welfare Ass'n v. Childers*, 197 Okl. 243, 171 P.2d 613, 614 (1946); *Gray v. Barton*, 55 N.Y. 68, 14 Am.Rep. 181 (1873).

6. 2 Schouler, Personal Property (3rd Ed.) 61 (1896); Brown, The Law of Personal Property (3rd Ed.) 114–115 (1975).

7. *State v. Moore*, 167 Okl. 28, 27 P.2d 1048, 1052 (1933).

8. *Greco v. Foster*, Okl., 268 P.2d 215, 220 (1954).

9. *Underside v. Lathrop*, 1982 OK 57, 645 P.2d 514, 516 n. 6.

lenge the constitutional validity of government action bear the burden of proving that it should be condemned.[10]

(10) Neither the *Act* nor the *Transaction* can be declared to be fraught with any infirmity ascribed to it by the protestants' tendered proof and by their legal argument.

¶ 1 KAUGER, Chief Justice, concurring in the denial of rehearing:

¶ 2 Because the protestants did not initially raise the balanced budget amendments, art. 10, §§ 23, 24 and 25,[1] they were not addressed by the Court in its opinion. We probably should have done so, especially because of the fifty-year indigent care provision.[2] Under this provision, it is anticipated

that the Legislature will make annual appropriations to the University Hospitals Authority (Authority). Pursuant to the leasing agreement with HCA Health Services of Oklahoma (HCA), HCA has agreed to provide indigent care to Oklahoma citizens in return for the Authority's promise to pay HCA the amounts appropriated for this service by the Legislature. Addressing art. 10, §§ 23 24 and 25 would not alter the outcome of the cause—the agreement does not violate these constitutional provisions—and it would provide certainty for financing mechanisms which are common in the increasingly complex financial arena.[3]

¶ 3 In matters *publici juris*, it is the Court's duty to take judicial notice of applica-

---

**10.** *TXO v. Oklahoma Corp. Com'n.,* 1992 OK 39, 829 P.2d 964, 968 n. 18.

**1.** The Okla. Const. art. 10, § 23 provides in pertinent part:

"The state shall never create or authorize the creation of any debt or obligation, or fund or pay any deficit, against the state, or any department, institution or agency thereof, regardless of its form or the source of money from which it is to be paid, except as may be provided in this section and in Sections 24 and 25 of Article X of the Constitution of the State of Oklahoma ..."

The Okla. Const. art. 10, § 24 provides in pertinent part:

"In addition to the above limited power to contract debts, the State may contract debtys to repel invasion, suppress insurrection or to defend the State in war ..."

The Okla. Const. art 10, § 25 provides in pertinent part:

"Except the debts specified in sections twenty-three and twenty-four of this article, no debts shall be hereafter contracted by or on behalf of this State, unless such debt shall be authorized by law for some work or object, to be distinctly specified therein; and such law shall impose and provide for the collection of a direct annual tax to pay, the interest on such debt as it falls due, and also to pay and discharge the principal of such debt within twenty-five years from the time of contracting thereof No such law shall take effect until it shall, at a general election, have bee submitted to the people and have received a majority of all votes cast for and against it at such election...."

**2.** The indigent care provisions states:

"HCA agrees to provide care at costs defined in the Agreement in return for the Authority's promise to pay to HCA the amounts appropriated for indigent care by the Legislature."

**3.** See, *In re Anzai,* 85 Hawai'i 1, 936 P.2d 637, 642 (1997); *Wilson v. Kentucky Trans. Cabinet,* 884 S.W.2d 641, 644–45 (Ky.1994); *Schulz v. State,* 84 N.Y.2d 231, 616 N.Y.S.2d 343, 639 N.E.2d 1140, 1148 (1994); *Dieck v. Unified School Dist. of Antigo,* 165 Wis.2d 458, 477 N.W.2d 613, 618 (1991); *Dykes v. Northern Virginia Transportation Dist. Comm'n,* 242 Va. 357, 411 S.E.2d 1, 4 (1991), *cert. denied,* 504 U.S. 941, 942, 112 S.Ct. 2275, 2277, 119 L.Ed.2d 201, 203; *Department of Ecology v. State Finance Committee,,* 116 Wash.2d 246, 804 P.2d 1241, 1246 (1991); *State v. School Bd. of Sarasota County,* 561 So.2d 549, 552 (Fla.1990); *State v. Goldschmidt,* 308 Or. 573, 783 P.2d 988, 995 (1989); *Caddell v. Lexington County School Dist. No. 1,* 296 S.C. 397, 373 S.E.2d 598 (1988); *Municipal Bldg. Auth. of Iron County v. Lowder,* 711 P.2d 273, 277 (Utah 1985); *Glennon Heights, Inc. v. Central Bank & Trust,* 658 P.2d 872, 877–78 (Colo.1983); *Baliles v. Mazur,* 224 Va. 462, 297 S.E.2d 695, 697–98 (1982); *Enourato v. New Jersey Bldg. Auth.,* 90 N.J. 396, 448 A.2d 449, 455 (1982); *Ruge v. State,* 201 Neb. 391, 267 N.W.2d 748, 750–51 (1978); *Edgerly v. Honeywell Information Sys., Inc.,* 377 A.2d 104, 108 (Me.1977); *McFarland v. Barron,* 83 S.D. 639, 164 N.W.2d 607, 609–10 (1969); *Berger v. Howlett,* 25 Ill.2d 128, 182 N.E.2d 673, 675 (1962); *Book v. State Office Bldg. Comm'n* 238 Ind. 120, 149 N.E.2d 273, 287 (1958); *Duff v. Jordan,* 82 Ariz. 228, 311 P.2d 829, 831 (1957); *State v. Armory Bd.,* 174 Kan. 369, 256 P.2d 143, 150 (1953). See also, *Texas Pub. Bldg. Auth. v. Mattox,* 686 S.W.2d 924, 928 (Tex.1985); *St. Charles City-County Library v. St. Charles Library Bldg. Corp.,* 627 S.W.2d 64, 67 (1981) [Multi-year lease terminable at will of municipality did not create a debt within meaning of constitutional provisions.]; *Opinion of the Justices,* 335 So.2d 376, 379 (1976) [Contract spanning from one to twenty years is not a "debt" as defined by constitutional provision if annual amount payable is to be derived from current revenues received.]; *State v. Giessel,* 271 Wis. 15, 72 N.W.2d 577, 583

ble constitutional provisions.[4] The statutory command[5] of 12 O.S.1991 § 2201[6] obligates this Court to take judicial notice of the common law, constitutions and public statutes. This is not merely a rule of practice which may be relaxed when the public interest demands.[7] The mandatory[8] duty to take judicial notice of public statutes may extend to **any stage of a proceeding.**[9] Pursuant to 12 O.S.1991 § 2203,[10] the command to take judicial notice extends to the appellate process. Matters of health care are of special public importance and subject to this Court's review as matters of *publici juris.*[11] Because my constitutionally and statutorily imposed duties require me to address art. 10, §§ 23, 24 and 25, I write separately in support of the majority opinion.

¶ 4 The Okla. Const. art. 10, §§ 23, 24 and 25[12] prohibit pledging the full faith and credit of the state of Oklahoma without a vote of the people. The proposal to fund the indigent care agreement through anticipated legislative appropriations does not entail a pledge of the full faith and credit. The agreement entails only a pledge of partial faith and partial credit—on an annual basis—of legislatively appropriated funds.

¶ 5 Unless prohibited by the Constitution, the Legislature has the right and the responsibility to declare the fiscal policy of Oklahoma. Even if this Court believes that a revenue crisis might result, we have no authority to consider the desirability, wisdom or practicability of fiscal legislation.[13] It is not this Court's prerogative to question the wisdom of the expressed policy. Whether an act is wise or unwise, whether it is based on sound economic theory or whether it is the best means to achieve the desired result are matters for legislative determination. Members of this Court, may not, based on a perception of how the State should conduct its business dealings, direct legislative decision making.[14] In construing constitutional debt-limitation provisions, it is the judiciary's duty to guard against indebtedness, not creative financing.[15] It is not illegal to accomplish a desired result, lawful in itself, by innovative, legal measures.[16]

(1955) [Obligation to pay periodic rentals contingent upon enjoyment of property is not a debt or the loaning of the credit of the state.]; *State v. Donahey,* 93 Ohio St. 414, 113 N.E. 263 (1916) [Upholding lease subject to appropriations of the Legislature.]

**4.** *Matter of McNeely,* 1987 OK 19, 734 P.2d 1294, 1296; 12 O.S.1991 § 2201(A) provides in pertinent part:
"A. Judicial notice shall be taken by the court of the common law, constitutions and public statutes in force in every state, territory and jurisdiction and the United States."

**5.** Use of "shall," by the Legislature is normally considered as a legislative mandate equivalent to the term "must," requiring interpretation as a command. *Fuller v. Odom,* 1987 OK 64, 741 P.2d 449, 453.

**6.** Title 12 O.S.1991 § 2201 provides in pertinent part:
"A Judicial notice shall be taken by the court of the common law, constitutions and public statutes in force in every state, territory and jurisdiction of the United States...."

**7.** *John Deere Plow Co. v. Owens,* 1943 OK ——, 194 Okla. 96, 147 P.2d 149, 153.

**8.** The use of "shall" by the Legislature is normally considered as a legislative mandate equivalent to the term "must," requiring interpretation as a command. *State ex rel. Macy v. Freeman,* 1991 OK 59, 814 P.2d 147, 153; *Forest Oil Corp. v.*

*Corporation Comm'n,* 1990 OK 58, 807 P.2d 774, 787; *Schaeffer v. Shaeffer,* 1987 OK 30, 743 P.2d 1038, 1040 (Okla.1987.)

**9.** Title 12 O.S.1991 § 2203 provides in pertinent part:
"... C. Judicial notice may be taken at any stage of the proceeding."

**10.** Title 12 O.S.1991 § 2203, see note 9, supra.

**11.** *Halstead v. McHendry,* 1977 OK 131, 566 P.2d 134, 136.

**12.** The Okla. Const. art. 10, §§ 23, 24 and 25, see note 1, supra.

**13.** In re *Initiative Petition No. 347,* 1991 OK 55, 813 P.2d 1019, 1031; *State ex rel. York v. Turpen,* 1984 OK 26, 681 P.2d 763.

**14.** *In re Initiative Petition No. 347,* see note 5, supra; *Palmer Oil Corp. v. Phillips Petroleum Co.,* 1950 OK ——, 204 Okla. 543, 231 P.2d 997, *appeal dismissed,* 343 U.S. 390, 72 S.Ct. 842, 96 L.Ed. 1022.

**15.** *Dieck v. Unified School Dist. of Antigo,* see note 3, 477 N.W.2d at 618, supra.

**16.** *State v. Giessel,* see note 3, 72 N.W.2d at 590, supra; *Tranter v. Allegheny County Auth.,* 316 Pa. 65, 173 A. 289, 297 (1934).

¶ 6 Twenty years ago, in *Halstead v. McHendry*, 1977 OK 131, 566 P.2d 134, 138, this Court analyzed a leasing agreement and bond issue in which retirement of the revenue raising bonds depended on the continuance of a leasing relationship over a fifteen-year period. In so doing, we looked at the Oklahoma Constitution, art. 10, § 26.[17] [Art. 10, § 26 applies to political subdivisions and is the counterpart of art. 10, § 25, requiring that before the state may enter into certain "debts", a vote of the public is required.]

¶ 7 In *Halstead*, the Court found no legal impediment to the validity of the multi-year lease agreement. It reached that result by acknowledging that constitutional debt-limitation provisions similar to the Okla. Const. art. 10, §§ 23, 24 and 25 did not obligate future County Commissioners to agree to the leasing agreement—just as the agreement here does not bind future legislatures to make anticipated appropriations. Promises or an expressed Legislative "intent" to continue the funding of a revenue raising project is not a "debt" within the meaning of constitutional debt-limitation provisions.

¶ 8 Although the voters in *Halstead* approved a resolution providing for the levy of a tax to assist in the maintenance of a health department, no election was held under the provisions of the Oklahoma Constitution art. 10, § 26 before the leasing agreement and bond issue were completed. Retirement of the revenue raising bonds depended on the continuance of the leasing relationship over a period of fifteen years. In upholding the financing scheme, the Court discounted arguments that actions of the present County Commissioners in executing the lease would "morally" obligate succeeding County Commissioners to continue the arrangement in future years. Rather, the *Halstead* Court found that the continuance of the leasing arrangement depended entirely upon the ac-

tions of the County Commissioners who would consider its renewal.

¶ 9 The renewal of the lease in *Halstead* was governed by the County Commissioners in office at the time the lease was presented. The lease was renewed on a year-by-year basis. Here, the agreement for indigent care is also subject to an annual review by current members of the legislative body. The Legislature will determine on a year-by-year basis in the appropriation process whether indigent care should be funded through the agreement with HCA. This Court recognized in *Halstead* that although the County Commissioners might feel a moral obligation to continue the lease, there was no legal impediment to approval of the leasing agreement—the agreement was constitutional. The fact that the Legislature might, under the agreement with HCA, feel some moral obligation to continue the agreement or to ensure that indigent care is provided to the needy of this state does not render the agreement void—the indigent care agreement, like the leasing agreement in *Halstead*, is constitutional.

¶ 10 Likewise, in *U.C. Leasing, Inc. v. State ex rel. State Bd. of Public Affairs*, 1987 OK 43, 737 P.2d 1191, 1195, we upheld a leasing arrangement spanning a period of sixty consecutive months. The lease agreement in *U.C.* explicitly provided that if the Legislature failed to allocate funds for payment, the obligation would cease at the end of the term for which there were allocated funds. The Court recognized that there was no binding promise to continue the lease. Instead, its terms were contingent upon the Legislature's providing funding on an annual basis.

¶ 11 In *U.C.* and here, a limited liability debt has been created. This Court stated that:

"Where a person or entity enters into a valid contract with the proper State offi-

17. The Okla. Const. art. 10, § 26 provides in pertinent part:

"(a) Except as herein otherwise provided, no county, city, town, township, school district, or other political corporation, or subdivision of the state, shall be allowed to become indebted, in any manner, or for any purpose, to an amount exceeding, in any year, the income and revenue provided for such year without the

assent of three-fifths of the voters thereof, voting at an election, to be held for that purpose ..."

The current version of the Constitution is cited. Although the provision has been amended since this Court promulgated *Halstead v. McHendry*, 1977 OK 131, 566 P.2d 134, the quoted language remains unchanged from the version in effect when the decision was rendered.

cials *and a valid appropriation has been made therefore,* the State has consented to be sued and has waived its governmental immunity to the extent of its contractual obligations and such contractual obligation may be enforced against the State in an ordinary action at law." [Emphasis supplied.]

This Court clearly limited the extent of the obligation to pay in *U.C.* to the extent that a "valid appropriation" had been made—precisely the situation outlined by the indigent care agreement here.

¶ 12 In *Indiana Nat'l Bank v. State ex rel. Dept. of Human Services,* 1993 OK 101, 857 P.2d 53, 57, the Court "cleared up" the misconception that, in a lease for the acquisition of computer equipment—a non-revenue producing item, a State agency could not enter into a lease/purchase agreement which would bind the State for a future fiscal year if it were conditioned solely on continued fiscal year appropriations by the Legislature. DHS believed that this was unconstitutional, and that the agreement had to contain a clause allowing termination at the end of each fiscal year. In explaining the fallacy of this belief, the Court reiterated the position it took in *U.C.,* stating:

"After the matters pertinent to this case transpired we decided *U.C. Leasing, Inc. v. State Board of Public Affairs,* 737 P.2d 1191 (Okla.1987), an opinion which cleared up the area of the law involving acquisitions of such equipment by State entities. In *U.C. Leasing* we held that State constitutional and statutory fiscal year limitation clauses were *not* violated where a 60 month lease (a State agency as lessee) explicitly provides that if the Legislature fails to allocate or appropriate funds for payment, lessee is not obligated to pay beyond the period for which funds have been allocated. *Id.* at 1195. The converse of this would, of course, be true, i.e. the agency would be bound if adequate appropriations were made by the Legislature. This is so because the obligation is not absolute and in all events binding on the State, but is contingent upon continued funding on a fiscal year basis by the Legislature continuing to appropriate funds to

satisfy the obligation. *Id.* Thus, it turns out DHS, as all now appear to concede, was wrong in its view on what could be agreed to in regard to the lease/purchase agreement."

There is no difference between leasing equipment requiring legislative appropriations spanning more than one legislative session and providing indigent care through an agreement which is based on anticipated future legislative appropriations. Long-term commitments, multi-year leases and contracts, have been upheld. Despite DHS's confusion in *Indiana Nat'l Bank,* this Court said the matter had been settled—multi-year commitments based on the possibility of future legislative appropriations did not violate constitutional debt limitation provisions.

¶ 13 The analysis for balanced budget and debt-limitation purposes does not change simply because an obligation is created by bonds, by leases or by multi-year agreements. The analysis turns not on the type of instrument but, rather, on whether an enforceable obligation is created beyond the fiscal year. This principle is buttressed by 62 O.S.1991 § 582(8) which provides a functional definition of obligations which does not distinguish between layers of transactions. The statute does not support a false distinction which would separate bond transactions, leases or other multi-year agreements. This section states:

" 'Obligation' means an agreement of a public entity to pay principal and any interest thereon, whether in the form of a contract to repay borrowed money, a lease, an installment purchase contract, or otherwise, and includes a share, participation or other interest in any agreement."

¶ 14 This analysis is further strengthened by 12A O.S.1991 § 3–103(9), a codification of basic contract law, in which a promise is defined:

" 'Promise' means a written undertaking to pay money signed by the person undertaking to pay. An acknowledgment of an obligation by an obligor is not a promise unless the obligor also undertakes to pay the obligation."

¶ 15 This analysis is further supported by a statute which has been the law in this

jurisdiction since 1890 [18]—when Oklahoma was Indian Territory—and which was incorporated into statutory law at statehood. The idea that a moral obligation to continue an agreement over a period of time may serve as consideration for a contractual obligation is nothing new. It has been with us always. Title 12 O.S.1991 § 107 provides:

"An existing legal obligation resting upon the promisor, as a moral obligation originating in some benefit conferred upon the promisor, or prejudice suffered by the promisee, is also good consideration for a promise, to an extent corresponding with the extent of the obligation, but no further or otherwise."

The fact that future legislatures might feel "morally obligated" to continue to fund the indigent care agreement does not alter the fact that the promise is sufficient consideration to support the contract. This concept did not pose a problem to framers of the Constitution who were elected to Oklahoma's first Legislature.

¶ 16 In the leasing cases, this Court recognized that vendors were willing to enter multi-year transactions with the state notwithstanding the lack of an enforceable promise to pay beyond the current fiscal year. These financing schemes are simply facts of economic reality recognized by promisors and promisees, lessors and lessees, and by the sellers and purchasers of bonds. The legal principles are the same regardless of the monetary amount of the undertaking. There is neither a principled nor a legal basis for distinguishing between multi-year "moral obligation" leases, multi-year "moral obligation" contracts, and multi-year "moral obligation" bonds. Such an inconsistent analysis simply would not fly. Prohibiting one would necessarily jeopardize the other. The full scope of the problems created by such an approach would be difficult to describe fully because its operative principles apply to seemingly unrelated contexts. Just one example is the recent enactment of 70 O.S. Supp.1997 § 5–106 [19] which allows school boards to contract with school superintendents for three year contracts.

¶ 17 For this Court to brush aside decades of case law dealing with methods of public finance would be cavalier at best. At this stage of our fiscal history, the abrupt change in the status of multi-year leasing agreements [20] from constitutional to unconstitutional would ring the death knell for economic development and replace it with economic chaos in which state government financing would come to a standstill while the political branches painfully tried to sort out the consequences.

¶ 18 The indigent care agreement is not subject to attack on the basis that it is not self-liquidating and will produce no revenue. The facts here are simply indistinguishable from other causes in which this Court has upheld similar arrangements. In *U.C.* the lease at issue covered communications switching equipment. In *Indiana Bank,* the lease was for computer equipment. No one contended in *U.C.* or in *Indiana Bank* that any revenue would arise even tangentially from the installation of the equipment.

¶ 19 Here, the indigent care agreement is financed from legislatively appropriated funds paid from the University Hospitals Authority (Authority) to HCA Health Services of Oklahoma (HCA) under the leasing agreement which spans fifty years. HCA has agreed to provide indigent care in return for the Authority's promise to pay to HCA the appropriations made by the Legislature. When the origination of the actual payments are traced, this transaction does not differ

---

18. Okla. Stat. Ch. 17, § 38 (Ind.Terr.1890).

19. Title 70 O.S. Supp.1997 § 5–106 provides: "The governing board of each school district in Oklahoma is hereby designated and shall hereafter be known as the board of education of such district. Except as otherwise provided in this section, the superintendent of schools appointed and employed by the board shall be the executive officer of said board and shall perform duties as said board directs. The board may contract with a superintendent for a term as mutually agreed upon but not to exceed three (3) years beyond the fiscal year in which the contract is approved by the board and accepted by the superintendent. . . ."

20. The Legislature has specifically prescribed that school districts may enter into contracts with a superintendent spanning a three-year period. Title 70 O.S. Supp.1997 § 5–106, see note 19, supra.

from arrangements where state buildings are rented by state agencies. The money for both transactions comes from the same coffer—state monies. There's just one pot of money. The building is constructed from state funds and the rent is paid from annual appropriations from the Legislature. Here, indigent care will be provided and paid for by state appropriations. There simply is no difference.

¶ 20 The Authority is an instrumentality of the state and subject to suit under some circumstances. However, the Authority's status does not convert the multi-year indigent care agreement to a constitutionally prohibited debt of the state. Even if HCA should sue the Authority under the agreement. HCA could only sue the Authority for the money appropriated by the Legislature to University Hospitals Authority intended for indigent care. If the Authority doesn't have monies to support the agreement, because legislative appropriations are not made, there is nothing for HCA to recover. There is no legally enforceable contract between this State's Legislature and either the Authority or HCA to make the anticipated appropriations necessary to satisfy the debt created by the agreement. At most, a "moral obligation" arises to continue funding.

¶ 21 Under *Halstead v. McHendry*, supra, *U.C. Leasing, v. State ex rel. State Bd. of Public Affairs*, supra; and *Boswell v. State*, infra; *Indiana Nat'l Bank v. State ex rel. Dept. Human Services*, infra; and the majority of jurisdictions[21] considering the effect of financing mechanisms comparable to the one mandated by the agreement here, the obligations created are not "debts" within the meaning of constitutional and statutory provisions similar to the Oklahoma Constitution art. 10, §§ 23, 24 and 25. Under these

cases, the financing procedures are not "debts" either because the enacting body is not bound legally to make future appropriations or because it is clear that the legislators did not intend them to be obligations of the states or their subdivisions.

¶ 22 This Court's decision in *Boswell v. State*, 1937 OK ——, 181 Okla. 435, 74 P.2d 940, supports the proposition that the agreement is constitutional. In *Boswell*, we acknowledged that a simple declaration by the Legislature that the bonds were not to be considered a debt of the State or of its political subdivision was not dispositive of the cause and we held that the bonds created unauthorized "debts" within the meaning of the Oklahoma Constitution art. 10, §§ 23, 24 and 25. However, the facts here are distinguishable from those in *Boswell* in two critical respects. In *Boswell*, there was: 1) an unequivocal pledge of taxes to the retirement of the bonds; and 2) the promise bound subsequent legislative officers to continue appropriations. Neither situation exists in this cause. There simply is no legally enforceable promise to appropriate funds or any responsibility imposed on future legislatures to do so. In fact, *Boswell* requires the opposite result. This Court defined the Legislature's role in fiscal matters and its limitations in *Boswell*:

"As we conceive it, the constitutional provisions dealing with the 'debt limit' of the state were adopted for the purpose of fixing the power and responsibility of legislation relating to the fiscal affairs of the state upon the existing legislative assembly, and to prevent one legislative assembly from laying its mandate upon a future one. The effect of these provisions is that one legislative assembly cannot guarantee the span of life of its legislation relating to the fiscal affairs of the state beyond the

21. *In re Anzai*, see note 3 supra; *Wilson v. Kentucky Trans. Cabinet*, see note 3, supra; *Schulz v. State*, see note 3, supra; *Dieck v. Unified School Dist. of Antigo*, see note 3, supra; *Dykes v. Northern Virginia Transportation Dist. Comm'n*, see note 3, supra; *Department of Ecology v. State Finance Committee*, see note 3, supra; *State v. School Bd. of Sarasota County*, see note 3, supra; *Caddell v. Lexington County School Dist. No. 1*, see note 3, supra; *Municipal Bldg. Auth. of Iron County v. Lowder*, see note 3, supra; *Glennon Heights, Inc. v. Central Bank & Trust*, see note 3, supra; *Baliles v. Mazur*, see note 3, supra; *Enourato v. New Jersey Bldg. Auth.*, see note 3, supra; *McFarland v. Barron*, see note 3, supra; *Berger v. Howlett*, see note 3, supra; *Book v. State Office Bldg. Comm'n*, see note 3, supra; *Duff v. Jordan*, see note 3, supra; *State v. Armory Bd.*, see note 3, supra. See also, *Texas Pub. Bldg. Auth. v. Mattox*, note 3, supra; *St. Charles City-County Library v. St. Charles Library Bldg. Corp.*, note 3, supra; *Opinion of the Justices*, note 3, supra; *State v. Giessel*, note 3, supra; *State v. Donahey*, note 3, supra.

period of its biennium. These provisions of the Constitution guarantee that the power of a subsequent legislative body either to acquiesce or repeal shall always be existent."

One Legislature cannot bind another. That is precisely why the full faith and credit of the state of Oklahoma is not pledged here— and why this agreement is not unconstitutional.

¶ 23 It has been shown that art. 10, § 23 [22] is inapplicable because no debt or obligation is created. The authority of the Legislature indubitably extends to all rightful subjects of legislation pursuant to the Okla. Const. art. 5, § 36.[23] The Okla. Const. art. 21, § 1 [24] authorizes the Legislature to establish and to provide support by the State for such other institutions as the public good may require as may be "prescribed by law." The term "prescribed by law" denotes legislative enactments——statutes promulgated by the governing legislative body.[25] Just as the Legislature prescribed review of the trust agreement by this Court: [26] the Legislature, by law has established the University Hospitals Trust.[27] It has given the Trust the power to enter into agreements with any entity for operation of facilities leased by the University Hospitals Authority.[28] The agreement approved by the Trust and entered into between the Authority and HCA provides that indigent care services shall be paid for through annual legislative appropriations.

¶ 24 The agreement does not compel future legislatures to appropriate money for indigent care. Art. 10, § 23 [29] of the Oklahoma Constitution prohibits one legislative body from binding a successive legislative entity. It does not create a debt against the state if the money is not appropriated. A creditor cannot compel the Legislature to make the anticipated appropriations. There is no debt in the constitutional sense. The Court cannot make business decisions for HCA. It has chosen, through the anticipation that it will continue to receive legislative appropriations, to provide indigent care to the citizens of Oklahoma. There is no guarantee of appropriations, the agreement is not backed by the full faith and credit of the state.

---

**22.** The Okla. Const. art. 10, § 23, see note 1, supra.

**23.** The Okla. Const. art. 5, § 36 provides:
"The authority of the Legislature shall extend to all rightful subjects of legislation, and any specific grant of authority in this Constitution, upon any subject whatsoever, shall not work a restriction, limitation, or exclusion of such authority upon the same or any other subject or subjects whatsoever."

**24.** The Okla. Const. art. 21, § 1 provides:
"Educational, reformatory, and penal institutions and those for the benefit of the insane, blind, deaf, and mute, and such other institutions as the public good may require, shall be established and supported by the State in such manner as may be prescribed by law."

**25.** *State ex rel. Strandberg v. State Bd. of Land Comm'rs*, 131 Mont. 65, 307 P.2d 234, 236 (1957); *Howard v. Cook*, 59 Idaho 391, 83 P.2d 208, 210 (1938); *Winters v. Hughes*, 3 Utah 443, 24 P. 759, 761 (1861).

**26.** Title 63 O.S. Supp.1997 § 3225.

**27.** Title 63 O.S. Supp.1997 § 3224.

**28.** Title 63 O.S. Supp.1997 § 3224.

**29.** The Okla. Const. art. 10, § 23, see note 1, supra. *Boswell v. State*, 1937 OK ——, 181 Okla. 435, 74 P.2d 940. See also, *Halstead v. McHendry*, note 17 at 138, supra.