In re Application of H. L. GOODWIN, Sr., Charles Hathaway and Pat Ballew, as Trustees of the Cherokee County Home Finance Authority and Board of County Commissioners of Cherokee County, Oklahoma, as Governing Board of the Beneficiary of the Cherokee County Home Finance Authority, Petitioners.

No. 53417.

Supreme Court of Oklahoma.

July 12, 1979.

---

18. *Braden Co. v. Robinson*, 171 Okl. 278, 43 P.2d 437, 438 [1935]; *Hudson v. Lee*, Okl., 393 P.2d 515, 520–521 [1964].

William P. Willis, Jr., Tahlequah, Okl., for Cherokee County Home Finance Authority, appellant.

Nathan H. Young, III, Asst. Dist. Atty., Tahlequah, Okl., for Bd. of County Com'rs of Cherokee County, appellee.

Robert L. Bailey, Norman, Okl., for Cleveland County Home Loan Authority.

Robert S. Gee of Wallace & Owens, Miami, Okl., for Ottawa County Home Finance Authority.

Richard W. Lock, Jay, Okl., for Delaware County Home Finance Authority.

Gary E. Payne, Atoka, Okl., for Coal County Home Finance Authority and Atoka County Home Finance Authority.

Michael P. Sullivan, Leach, Sullivan, Sullivan & Green, Duncan, Okl., for Stephens County Home Finance Authority.

Georgina B. Landman, Williams, Landman & Savage, Tulsa, Okl., for Builders Ass'n of Metropolitan Tulsa.

Darven L. Brown, Smith, Brown, Martin & Adkisson, Tulsa, Okl., Thomas G. Hilborne, Jr. of Jones, Givens, Brett, Gotcher, Doyle & Bogan, Inc., Tulsa, Okl., for Tulsa County Home Finance Authority.

Farrell M. Hatch, Spears, Hatch, Mickle & Wilhite, Durant, Okl., for Bryan County Home Finance Authority.

Duke J. Logan, Logan, Lowry & Johnston, Vinita, Okl., for Craig County Home Finance Authority.

Michael T. Norman, Norman & Watkins, Muskogee, Okl., for Muskogee County Housing Authority.

John R. Carle, Carle & Tanner, Claremore, Okl., for Rogers County Home Finance Authority.

James W. Rodgers, Jr., Rodgers & Allen, Holdenville, Okl., for Hughes County Housing Finance Authority.

John T. Spradling, Stephen P. Friot, Spradling, Stagner, Alpern, Friot & Jones, Oklahoma City, Okl., C. D. Northcutt, Northcutt, Northcutt, Raley, Clark, Gardner, Hron & Northcutt, Ponca City, Okl., Edward L. Jacoby, Houston & Klein, Tulsa, Okl., for Continental Federal Sav. and Loan Ass'n, Frontier Federal Sav. and Loan Ass'n and Sooner Federal Sav. and Loan Ass'n.

OPALA, Justice:

This is an appeal from judgment rendered in a proceeding instituted under 60 O.S.1971 § 175.23[1] to construe the trust instrument that created a public housing authority presumably under the provisions of 63 O.S.1971 § 1051 et seq.[2] The sole question presented is whether the trial court's conclusion that the Cherokee County Home Finance Authority [Authority] must be restricted in its activities to the geographical boundaries of Cherokee County [the entity which is the beneficiary of the trust] is correct as a matter of law.

 If the matter sought to be presented by this appeal could be decided

by answering the narrow question posed in total isolation from the very bedrock of the judgment,[3] there would be little, if any, opposition from amici curiae [Continental, Frontier and Sooner Federal Savings and Loan Associations] who contend that the appeal does not come in a sufficiently adversary posture because there was but a friendly suit below and no briefs in opposition were filed by appellee here. We are urged either to dismiss the appeal or confine our review to the narrow issue by the resolution of which Authority claims to be aggrieved. Amici rely, inter alia, on our opinion in *Application of Fun Country Development Authority*[4] for their attempt to secure dismissal of this appeal or, in the alternative, to strictly circumscribe the litigable issues to the narrow question presented. Amici's efforts stand on fragile underpinnings. Since they were not parties below, they lack standing to alter the posture of appellate litigation[5] by injecting nonjurisdictional issues of their own.[6] Whenever widespread interest may demand an immediate resolution of some vital public law issue, *no* impediment arising from infirmity in the procedural posture of the case—however well recognized in purely private litigation—will bar our exercise of reviewing powers.[7]

Were we to accede to amici's argument and refuse to pass *expressly* on any aspect of the loan-delivery plan before us, our affirmance of the judgment under consideration, though in effect an *implicit* approval of that plan, would more than likely leave the marketplace in uncertainty and with lingering doubts. The unanswered questions inevitably would be pressed on us for

---

1. Oklahoma Trust Act.

2. Oklahoma Housing Authorities Act.

3. Which establishes the legality of the public trust purpose.

4. Okl., 566 P.2d 1167 [1977].

5. In *State ex rel. Nesbitt v. Ford*, Okl., 434 P.2d 934, 939 [1967] we would not consider constitutional issues raised by amicus curiae because they had not been presented by the parties below.

6. In *Muskogee Gas & Electric Co. v. Haskell et al.*, 38 Okl. 358, 132 P. 1098 [1913] we did dismiss an appeal on amici's motion alleging the controversy was fictitious and hence nonjusticiable. The issue was apparently treated as jurisdictional.

7. *Payne v. Jones*, 193 Okl. 609, 146 P.2d 113, 116 [1944]; *Special Indemnity Fund v. Reynolds*, 199 Okl. 570, 188 P.2d 841 [1948]; *Barks v. Young*, Okl., 564 P.2d 228, 229 [1977].

settlement in litigation yet to follow. An early decision is clearly in the best interest not only of the general public but of the lending institutions and the financial community as well. The same course is also indicated by judicial economy and by a sense of concern for the prompt resolution of important public rights.

 The appeal was timely brought here. Want of answer brief from the appellee or the existence of other reasons which cause the adversary process on appeal to fail cannot afford a basis for dismissal unless it be shown that the action was collusive or fictitious. Neither fictitiousness nor collusion may be inferred from the mere fact that the suit was a friendly one and was pursued without rancor. The power of the court to dismiss a case as fictitious should not be exercised unless the fictitious character appears either from the pleadings or from satisfactory evidence. This is especially true where as here, persons who intimate that the suit is fictitious failed to appear, make their objection and avail themselves of the point in the trial court.[8] Neither by affidavit nor by other proof did amici show us facts sufficient to establish the fictitious or collusive character of the instant action.

This case is clearly distinguishable from *Fun Country*. It is an appeal in which review is affordable by right, whereas *Fun Country* was an original proceeding in which this court may exercise broad discretion in deciding whether to assume, or decline to accept, jurisdiction. Although the issues before us are not sharply drawn and there is an absence of that high level of adverseness which would provide an ideal forensic climate for adjudication, the appeal is properly here and our review cannot be avoided.[9]

We hold that this appeal is properly before us and that our task here is to review the record to determine if appellant is entitled to a complete and meaningful relief under its petition in error.[10] Amici's motion to dismiss is accordingly denied.

This litigation was no doubt precipitated by our decision in *Shotts v. Hugh*[11] where we reaffirmed our commitment to the view that providing safe, decent and adequate housing for the people in this state constitutes a proper public function. We found in *Shotts* a fatal [vitiating] defect in the virtually unrestricted loan-to-lenders delivery system. The trust indenture was devoid of any limitation on who could borrow funds from proceeds of mortgage revenue bond sale. Shortly after our decision in *Shotts* the legislature amended the Public Trust Act[12] by expressly authorizing trusts to be created for the purpose of providing financing of public housing projects. The vices which led to our invalidation of the loan-to-lenders vehicle seem to have been conspicuously excised from the Authority's program under consideration. The new features included are: [a] an ascertainment of the low-to-moderate income class within the county based upon an analysis of a demographic study and on other available data[13] [b] establishment of guidelines for

---

8. While " . . . within the framework of our adversary system, the adjudicatory process is most securely founded when it is exercised under the impact of a lively conflict between antagonistic demands, actively pressed . ." [*Poe v. Ullman*, 367 U.S. 497, 503, 81 S.Ct. 1752, 1755, 6 L.Ed.2d 989 [1961], it does not follow that want of a sharp conflict is to be equated *per se* with collusion or fictitiousness. *Pearce v. City of Roseburg*, 77 Or. 195, 150 P. 855 [1915].

9. *Payette-Boise Water Users' Ass'n, Limited v. Fairchild et ux.*, 35 Idaho 97, 205 P. 258 [1922]; *Elias v. Erwin*, 129 Cal.App.2d 313, 276 P.2d 848, 852 [1954].

10. Where appellee fails to file a brief, *and the question is of a public nature*, the court will search the record in the case and determine the cause as it sees fit based upon the law and the facts. *Atchison, T. & S. F. R. Co. v. Johnson*, 85 Okl. 161, 204 P. 910 [1922]; *Baker v. Braden*, 165 Okl. 12, 24 P.2d 293, 294 [1933].

11. Okl., 551 P.2d 252 [1976].

12. 60 O.S.Supp.1976 § 178.6.

13. Authority approved maximum income of $17,500 for low-to-moderate income persons participating under the program. It also defined the term "maximum income" for the lending institutions to use in computing actual

its loan-delivery system and [c] extending an opportunity to all mortgage lenders in the county to participate in the program. After making specific findings as to a critical shortage of housing and mortgage credit for the low-to-moderate income class, the Authority authorized the issuance of tax-exempt revenue bonds to finance the residential mortgage loan program. The loan-delivery system set up would begin with the sale of mortgage revenue bonds, the proceeds of which would provide funds for home loans to county families of low-to-moderate income. The loans would be secured by a first mortgage [on owner-occupied residential units] in favor of the Authority with mortgage loan payments to be collected by a bank acting as trustee for the bondholders. The bonds would be further secured by capitalized reserves and mortgage loan insurance. Loans could be originated and serviced by any mortgage lending institution willing to participate in the program. Its sole compensation would consist of a fee for originating and servicing the loans. The bonds, as limited obligations of the Authority, would not constitute a debt of the county.

Amici contend that the restrictions are still so inadequate that we should again find, as we did in *Shotts*, that the present system is as impermissible as that found in "Loans-to-Lenders Bond 1976 Series". Among the vices called to our attention are the following "unanswerable questions": [1] What proportion of the residential housing market would be eligible for loans under the maximum income criterion ($21,500 for a family of four)? [2] To what extent is the eligible market already being served by existing home financing sources? [3] What is the maximum value of property which may be financed? [4] Can duplexes or other income property qualify? [5] Can bond proceeds be borrowed to refinance existing loans? [6] Can any one borrower make more than one loan from the proceeds of a bond issue?

These "unanswered questions", although well reasoned, are not all left to conjecture. The loan-delivery system provides detailed restrictions on the maximum-income level for borrowers. The demographic study made by the Authority has adequately identified the need to be met. The trust indenture clearly sets out the requirement that dwellings financed under this program must be owner-occupied. A duplex in which one side was either rented or vacant would not qualify as owner-occupied. Other questions, which may seem unanswered, do not appear to be of sufficient gravity and magnitude to authorize a judicial destruction of the legislative intent by declaring the loan-delivery system here under consideration lacking in public purpose. Courts do not concern themselves with the merits, wisdom or advisability of legislative enactments but only with their meaning and validity.[14] No matter what our individual preference may dictate, as a service of government that is constitutionally relegated to a position of detachment and neutrality, we must resist personal temptation and remain true to our mission when forces competing in the marketplace call on us either to advance and promote or to hinder and retard implementation of legally unassailable legislative experiments in economic policy making.

Amici advance a far more convincing argument for monitoring the lending operations of housing trusts than they do against the public purpose *nexus* of the Authority's program. Their appealing plea might be more appropriately presented to a legislative committee.

 The scheme we considered in *Shotts* may be characterized broadly as one providing lenders with unrestricted publicly-generated funds. In this sense the scheme lacked the necessary public purpose *nexus*. It was therefore struck down. The safeguards mandated in *Shotts* [the financing of programs to upgrade sub-standard

income. Eligible applicants would receive low interest credit to purchase homes or upgrade sub-standard housing.

14. *Blackwell Zinc Company v. Parker*, Okl., 406 P.2d 965, 969 [1965]; *Haas v. Holloman*, Okl., 327 P.2d 655, 658 [1958].

housing and providing adequate housing for low-income groups] have been met here. Based on a demographic study, restrictions on lending have been fashioned and the loan flow will be effected directly to the eligible borrowers rather than through the largely unrestricted loan program to potential lenders. We now conclude that the trust created by the Authority is a valid public trust for an authorized and proper public purpose.

We reject the Authority's contention that it may operate beyond the geographical boundaries of the county. This contention is based on the premise that a public housing program may draw its powers from general trust law unrelated to the provisions of the Oklahoma Housing Authorities Act of 1965. We cannot accede to this view. Housing authorities are a creature of the entity which gives them birth. Under the provisions of 63 O.S.1971 § 1058, their authority must be deemed coextensive with the jurisdictional boundaries of the creating governmental entity. The cases cited by the Authority are inapposite here. They involve specific projects by municipalities which had been statutorily authorized for construction outside the city's corporate limits. There is no similar statutory enactment which would extend the outer reach of this public housing authority beyond the boundaries of the county.

The demographic conditions in each county are different. While we permitted all other housing authorities to file briefs amici curiae, we denied their plea in intervention, mindful as we were that with differences in demographic data and financing characteristics, each loan-delivery system should be considered on its own. We therefore reaffirm our previous order denying intervention.[15]

We reaffirm our total commitment to *Shotts* and *Fun Country*. This trust meets the necessary restrictions to pass the "public purpose" muster. Its loan-delivery system is adequately designed to promote financing of housing for low-to-moderate income groups—an authorized public purpose. The questions which remain unanswered are not sufficient in magnitude and gravity to vitiate, under the *Shotts* criteria, the rational relationship between this financing program and the public purpose of providing a loan-delivery system for the low-to-moderate income groups within the county.

Deciding as we do today that the Authority's loan-delivery system appears legally sufficient to meet its public purpose—an issue thrust on us only obliquely and by adroit implication—we do not give approval to district court litigation of housing trust issues in a forensic framework so transparently friendly as to leave the judge virtually without a choice between viable and available competing alternatives. Whenever an exercise of choice may appear hampered or limited, the trial court should call upon the Attorney General to make an appearance in the case. Our public trusts are to be treated as descendants of charitable uses.[16] In this arena of public law the Attorney General has both a time-honored place and the necessary power to discharge the responsibility which resides in that office.[17] Had amici urged here that we call upon that official for a brief or that we remand the case for rehearing with his participation, we might have been inclined to grant their motion.

We find no errors in the trial court's judgment. The public purpose has been met and the restriction to the geographical

15. Because of its potential issue-mutating effect on the procedural posture on review, intervention is generally impermissible at the appellate stage. *Stephens v. First Nat. Bank of Nevada*, 64 Nev. 292, 182 P.2d 146, 153 [1947]. See *Vaughan v. Latta*, 168 Okl. 492, 33 P.2d 795, 797 [1933]. In the last case we cited with approval *In re Chewaucan River*, 89 Or. 659, 171 P. 402, 403 [1918], where the rationale for the rule stands expressed thusly: " . . . to admit strangers to participate in litigation [on

appeal] . . . would be the exercise of original jurisdiction . . .".

16. *Board of County Commissioners v. Warram*, Okl., 285 P.2d 1034, 1041 [1955]; *Phillips v. Chambers*, 174 Okl. 407, 51 P.2d 303, 309 [1935].

17. *Sarkeys v. Independent Sch. Dist. No. 40, etc.*, Okl., 592 P.2d 529, 533 [1979].

boundaries of Cherokee County is deemed proper.

Affirmed.

LAVENDER, C. J., IRWIN, V. C. J., and WILLIAMS and SIMMS, JJ., concur.

HODGES and HARGRAVE, JJ., concur in part and dissent in part.

HODGES, Justice, concurring in part, dissenting in part.

The petitioners present only one appealable issue which is the trial court's ruling that restricted the activities of the Authority to the geographical boundaries of Cherokee County, Oklahoma. I concur with the majority opinion of the Court which affirms the trial court's judgment on this issue.

I dissent to that part of the opinion which reviews and affirms the judgment as to the validity of the trust creating the Cherokee County Home Finance Authority. That issue has not been presented in an adversary posture.

I would adhere to the principles announced by our Court in *Application of Fun Country Development Authority, 566 P.2d 1167 (Okl.1977)* that we will issue no advisory opinions where no controversy is presented and no contest or challenge is made.

I am authorized to state that HARGRAVE, J., concurs in this concurring in part, dissenting in part opinion.