Dear Mr. McMahan:
The Attorney General has received your request for an official Attorney General Opinion in which you ask, in effect, the following questions:
 1. When a school district utilizes a lease-purchase agreement to finance acquisition or construction of a school building and title to the building (or some component thereof) is not transferred to the district until the end of the contract, the exercise of a purchase option or the payment of a scheduled installment, what sources of funds are lawfully available to the district for payment of the interest component under such an agreement?
 2. Under what circumstances, if any, may a public trust with an Oklahoma municipality as beneficiary, issue revenue bonds to finance a building or other facilities for a school district outside the geographic boundaries of the municipality, where the municipality does not appear to have any connection with the district or obtain any benefit other than the generation of administrative fees for financing the project?
Your questions generally involve the ability of a school district to acquire and finance a school building or related facilities through a lease-purchase mechanism. You first ask what source or sources of funds may be used by a school district to pay the interest component of a lease-purchase installment. The second question involves using a public trust to finance such a transaction. The trust would issue revenue bonds to acquire the property, then lease it to a school district with payments due over a period of years. However, the school district in question two is located entirely outside the geographic boundaries of the municipality that is beneficiary of the public trust. *Page 2 
 BACKGROUND
The inquiry arises, in part, because of a recent newspaper article[1] reporting widespread use of the "lease-purchase" method of financing buildings and other facilities by school districts,[2] in conjunction with issuance of general obligation bonds[3] ("g.o. bonds") by the district.
Further, the Article reports that at least one, and perhaps more, public trusts with a municipality or county as beneficiary have been financing these school transactions by issuing revenue bonds, the proceeds of which are used to build or purchase the facilities; these are then leased to the school district for a period of years, with the school district making installment payments which include components for principal and interest in accordance with 62 O.S. 2001, § 430.1[62-430.1].Article, at 4A, ¶ 1. It is reported that one such municipal-beneficiary trust has financed projects for schools more than 100 miles away from the limits of the city.[4]
You state in your letter[5] that in your review of audits of school districts and in conducting special audits of school districts,[6] you have become aware of these kinds of transactions and "in our review *Page 3 
of audits of school districts and in special audits of school districts, we may very well be called upon to review transactions for the acquisition of school buildings or other facilities utilizing one or both of the scenarios described in my questions." Further, you stated, "[f]inancial statements and audits of school districts do not always clearly specify the source of funds used to pay interest on building leases or lease-purchase agreements." Id. Thus, you seek guidance on these types of financing transactions.
 SOURCES FOR PAYMENT OF LEASE-PURCHASE INTEREST
In Attorney General Opinion 02-43 we concluded that "general obligation bond proceeds cannot be used to pay interest due under a lease obligation," because "to `acquire' property under Article 10, Section 26(a), bond proceeds must be used to obtain tangible property, and not be used for interest." Id. at 266, n. 8. We reaffirm this conclusion, with the qualification that under 62 O.S. 2001, § 753[62-753](B), bonds may be issued under the General Obligation Public Securities Refunding Act to refund, pay or discharge outstanding obligations, including any interest thereon.
While Opinion 02-43 mentioned the use of public trusts in some school district lease-purchase transactions, neither 70 O.S. 2001, § 5-117[70-5-117](B) nor 62 O.S. 2001, § 430.1[62-430.1](D) specifies whether the lessor is to be a private or a public entity. We conclude that whether a public trust or a private entity such as a bank or commercial vendor is the lessor of the property, it is immaterial to the question of the source from which interest is to be paid.
The argument that interest on a lease may be treated as "capital expenditure" and thus paid from g.o. bond revenues was not addressed in Opinion 02-43, so we discuss it here. The Oklahoma School Code, 70 O.S. 2001 Supp.2007, §§ 1-101 - 26-105.1, ("School Code") in Section 5-117(B), and another leasing statute, 62 O.S. Supp.2007, § 430.1(D), both expressly anticipate and allow the payment of interest by a school district on a lease of property; however, no provision is made in either of these statutes as to the source of such interest payment. Each statute makes clear that such interest is to be treated as acurrent expense, i.e., one incurred and paid during the then-current fiscal year. Id.
The School Code, in Section 1-117(B), relating to a district's use of its general fund, defines "capital expenditure" in pertinent part as follows:
 A. The general fund of any school district is hereby defined as a current expense fund and shall consist of all revenue or monies that can legally be expended *Page 4 
within a certain specified fiscal year, but shall not be considered as including any money derived from a special building fund levy made in accordance with the provisions of Section 10 of Article X of the Oklahoma Constitution, nor shall it include any monies derived from the sale of bonds issued under the provisions of Section 26 of Article X of the Oklahoma Constitution. All monies derived from the proceeds of the school levies made pursuant to the provisions of Section 9 of Article X of the Oklahoma Constitution shall be placed in the general fund provided by this section. Expenditures from the general fund shall be noncapital in nature. All monies derived from state-dedicated revenue, state-appropriated revenue unless otherwise provided for by law, and county sources shall be placed in the general fund provided for by this section. Except as provided for in subsections K and L of this section, a district shall not be authorized to make capital expenditures as defined by this section from the general fund.
 . . . .
 C. For the purposes of this section, a capital expenditure shall be an expenditure which results in the acquisition of fixed assets or additions to fixed assets. Capital expenditures shall include, but shall not be limited to, purchases of land or existing buildings, purchases of real property, improvements of grounds and sites for construction purposes, all expenditures for construction of buildings unless authorized by the State Board of Education or the State Board of Career and Technology Education upon application to the appropriate state board pursuant to subsection F of this section, additions to buildings, remodeling of buildings if such remodeling involves changes to roof structures or load-bearing walls, professional services, salaries and expenses of architects and engineers hired or assigned to capital projects except for such services, salaries and expenses as are applicable in preparation for a bond issue, expenditures for the initial installation and extension of service systems and built-in heat or air equipment to existing buildings, expenditures for the replacement of a building which has been destroyed, installments and lease payments on property, excluding interest, that have a terminal date and result in the acquisition of property, and expenditures for preliminary studies made prior to the time that authority to proceed with a construction project is given if authority is received within the same fiscal year that the expenditure was made.
 D. Noncapital expenditures shall include, but shall not be limited to expenditures for maintenance, repair and replacement of property and equipment, initial or additional purchases of furniture and equipment, direct expenses for maintenance of plant, including grounds, salaries for maintenance of plant, including salaries for the upkeep of grounds, and repair and replacement of *Page 5 
building structures which do not add to existing facilities and which do not involve changes in roof structures or load-bearing walls and which are not classified as a capital expenditure by this section.
Id. (emphasis added). Thus, under the School Code interest on a lease obligation is not treated as a capital expense, and therefore, by virtue of subsection (D) above, must be treated as a noncapital expenditure. The consequence is that interest on a lease (or lease-purchase) cannot be treated as acquisition of a tangible or capital item, and thus cannot be paid for from the proceeds of bonds issued under Oklahoma Constitution Article X, Section 26.
But what then, is the source of payment of such interest? The answer, we conclude, is from the district's general fund or its capital improvement (building) fund. The School Code provides that the various funds and accounts available to a district are:
 1. A general fund, to account for all monies received and disbursed for general school district purposes, including all assets, liabilities, reserves, fund balances, revenues and expenditures which are not accounted for in any other fund or special ledger account;
 2. Special revenue funds, as required, to account for the proceeds of specific revenue sources that are restricted by law to expenditures for specified purposes;
 3. Debt service fund, which shall include the school district sinking fund, established to account for the retirement of general obligation bonds, building bonds, transportation bonds or other long term debt and payment of interest thereon and judgments as provided by law. Any monies pledged to service general obligation bonds, building bonds, transportation bonds or other long term debt must be deposited in the debt service fund;
 4. Capital improvement fund, to account for financial resources segregated for acquisition, construction or other improvement related to capital facilities other than those financed by general long term debt;
 5. Enterprise funds, to account for operations that are financial and operated in a manner similar to private business enterprises where the intent of the governing body is that the costs (expenses, including depreciation), of providing goods or services on a continuing basis be financed or recovered primarily through user charges or where there is a periodic need to determine revenues earned, expenses incurred or net income for a service or program;
 6. Trust and agency funds, to account for assets held by the school district as trustee or agent for individuals, private organizations or other governmental *Page 6 
units or purposes, such as a retirement fund, employee health insurance fund or a school activity fund;
 7. Internal service funds, to account for the financing of goods or services provided by one department or agency of the school district to another department or agency, or to another government, on a cost reimbursement basis;
 8. A ledger or group of accounts in which to record the details relating to the general fixed assets of the school district;
 9. A ledger or group of accounts in which to record the details relating to the general obligation bonds, building bonds, transportation bonds or other long term debt of the school district; or
 10. Such other funds or ledgers as may be established by the board of education.
70 O.S. 2001, § 5-158[70-5-158] (emphasis added). Our inquiry thus requires analysis of these funds to determine which are available for interest on leases. First, for constitutional purposes, a lease or lease-purchase agreement is not treated as long term "debt." See Hoover Equip. Co. v.Bd. of Tax Roll Corr., 436 P.2d, 645, 647-49 (Okla. 1967); In re Okla.Capitol Improvement Auth., 355 P.2d 1028, 1031 (Okla. 1960);Halstead v. McHendry, 566 P.2d 134, 137-38 (Okla. 1977); A. G. Opin. 99-73, at 366. Thus, the debt service fund (limited to payment of long term debt) is not available for this purpose.
Attorney General Opinion 02-14 analyzed and discussed in detail the use of money in a school district's general fund, and concluded the general fund may not be used to pay principal or interest on bonded (i.e., long-term) indebtedness issued under OKLA. CONST. art. X, § 26 or pertinent sections of the School Code. Id. at 82. The general fund, however, is available to pay interest on a lease-purchase (short-term) obligation. Id.
The capital improvement (building) fund may also be used, since the latter fund is available for "improvement[s] related to capital facilities other than those financed by general long term debt." 70 O.S. 2001, § 5-158[70-5-158](4). While there are no cases or Attorney General Opinions providing guidance on the use of money in a school district's capital improvement or building fund (see OKLA. CONST. art.X, § 10), similar language is found in 19 O.S. 2001, § 901.46[19-901.46](4) with respect to fire protection districts. In A. G. Opin. 87-139, we concluded that money in such a district's capital improvement fund could properly be used for capital improvements not financed by long-term debt. Id. at 255-56. Thus, we conclude the general fund or the building fund is the appropriate source for payment of lease-purchase interest.
An ancillary, but related issue, is whether the interest on a lease-purchase obligation can lawfully be "rolled into" or capitalized through an increased principal installment under a lease agreement. Since *Page 7 
this structure is a likely variation in a lease-purchase transaction we briefly address this issue. May a lessor include nothing forinterest, but increase the principal amount of the obligation to compensate the lessor for the value of its investment? We conclude a school district cannot lawfully participate in such an arrangement since a political subdivision such as a school district cannot do indirectly that which it is prohibited from doing directly. See Reherman v. Okla.Water Res. Bd., 679 P.2d 1296, 1301 (Okla. 1984). Thus, a school district cannot legally undertake to pay an inflated amount of principal on a lease which includes, in effect, a component for interest. Such payment of an artificially increased amount would result in a violation of OKLA. CONST. art. X, § 26 by causing the school district/lessee to pay interest on a lease from the proceeds of general obligation bonds under the guise of a larger principal installment, but with the district acquiring no tangible property as a result. *Page 8 
 LEASE-PURCHASE TRANSACTIONS FINANCED BY A PUBLIC TRUST OPERATING OUTSIDE THE GEOGRAPHIC LIMITS OF ITSBENEFICIARY
According to the Article and your letter, some school financing involves a lease-purchase structure whereby the school district will lease a building to be financed by a public trust and will make payments over a term of years.[7]
Oklahoma statutes, case law and previous Attorney General Opinions have generally discussed the nature of public trusts.[8] For purposes of this Opinion, it is sufficient to note that under 60 O.S. 2001, § 179[60-179], trustees of a public trust formed under the requirements of Title 60 "shall be an agency of the state and the regularly constituted authority of the beneficiary for the performance of the functions for which the trust shall have been created." Id. The creation of a municipal-beneficiary public trust must be authorized by the governing body of the city or town, and where the trustees are appointed by the municipal governing body, there is a presumption the trust is acting on behalf of the municipality. 60 O.S. Supp.2007, § 176.1(A)(3). A public trust may exercise no greater powers than those authorized in the documents creating it (60 O.S. 2001, § 177.1[60-177.1]), but in any event the powers of such a trust may not exceed those "authorized and proper" public functions of its municipal beneficiary (60 O.S. Supp.2007, § 176(A)), or the powers which the Legislature might authorize the beneficiary to exercise. Warram, 285 P.2d at 1040; Morris, 299 P.2d at 136; Shipp, 498 P.2d at 1398; A. G. Opin. 04-20, at 125.
Annual payments on a lease-purchase agreement from a school district to a public trust, as described in the Article and your letter, would result in the school district obtaining title to certain discrete components of the building such as doors and windows, HVAC systems, metal roofs, etc. when the payment is made. Presumably, as in the case of most lease-purchase agreements, payments consist of principal installments and amounts attributable to interest. See 62 O.S. Supp.2007, § 430.1(D). The principal component of the lease-purchase payment is made from the proceeds of g.o. bonds issued from time to time by the school district; provided, bond proceeds may only be used to make principal installments if the school district actually acquires title to identifiable capital items. See A. G. Opin. 02-43, at 265-68. Under Opinion 02-43, proceeds of the g.o. bonds may not lawfully be used to pay interest due under the lease-purchase agreement. Id. While the leasing statutes do not specify the source of money for interest payments, under the first section of this Opinion, we conclude such *Page 9 
money must be taken from the school district's general fund or capital improvement (building) fund. Id. at 267-68.
Such local revenue bonds or lease-purchase financing transactions are not subject to review or approval by the Attorney General, the Council of Bond Oversight, the State Bond Advisor, the State Department of Education or other state agency. According to the Article and information included in your letter, the transactions are reported in the school district and public trust audits, although details of the transactions are often limited.[9] The Article reported that the State Auditor and Inspector had referred such school district/public trust transactions to the Attorney General's office in 2005 and claimed the Attorney General's office "had already deemed the process legal."[10]
To the contrary, while Attorney General Opinion 02-43 indicated that a lease-purchase agreement, properly structured, might lawfully be used to assist a school district in financing a building, nowhere in the Opinion is such an alternative discussed (much less approved) where a public trust far removed from the school district is the issuer of the lease-purchase obligations. See id. at 258-68. A search of other records in the office of the Attorney General fails to reveal any instance where this office has issued an Opinion on, much less approved, public trust financing of a school project many miles away from the corporate limits of the trust's municipal or county beneficiary. We now examine that question.
Attorney General Opinion 00-26 concluded that a public trust created pursuant to 60 O.S. 1991 and Supp.1999, §§ 176 — 180.4, which has "more than one county as its beneficiary, may issue revenue bonds to finance the acquisition of [multi-family] residential properties not located within the boundaries of the beneficiary counties," so long as such issuance is consistent with the standard enunciated in Warram; namely, the "transaction must provide a benefit to a large class of the public within the beneficiary count[y or municipality,] or lessen the burdens of government within the beneficiary count[y or municipality]."Id. at 122; Warram, 285 P.2d at 1041. Opinion 00-26 observed:
 In the context of a county beneficiary public trust or a public trust having multiple counties as its beneficiary, the Warram test allows only for functions which provide a benefit to the beneficiary counties or lessen the governmental burdens of the beneficiary counties. This could, in the appropriate factual setting, be accomplished by programs operating outside the county. For example, where projects outside the county provide economic benefits to the beneficiary, such as additional jobs or housing for county residents, there would be a benefit to the county. However, a project which merely uses a trust to generate fees from providing a financial *Page 10 vehicle with no other economic benefit to the beneficiary county from the project itself does not provide sufficient benefit to the county or lessen the burden of county government as required by the Warram standard.
 The extent to which a public trust can operate within or without its jurisdictional boundaries is governed by the Warram standard. Trust activities must be of some benefit to the citizens of the beneficiary, or lessen the burdens of government of the beneficiary. The Public Trust Act is not an open-ended authorization for a public trust to engage in any business activities. Whether a particular transaction or project meets the Warram test is a question of fact that cannot be addressed in an Attorney General Opinion.
Id. at 122 (emphasis added).
In other words, in a given factual situation, a project outside a municipality or county that benefits the beneficiary in some way other than merely generating fees from furnishing the financing may properly be done under the Warram standard.
A good example is the Oklahoma City-beneficiary trust that owns water rights in lakes in southeast Oklahoma and owns and operates a water pipeline of 100 miles or more in length to deliver water to Oklahoma City residents. Title 11 O.S. 2001, § 35-101[11-35-101] expressly empowers a municipality to extend utilities outside its municipal limits to acquire or sell water. It can scarcely be questioned that providing water to residents of a municipality is a worthy and lawful public purpose of benefit to the beneficiary community.
Further, in other Oklahoma statutes referred to in the Warram
decision,[11] gifts to a municipality (such as those made by a public trust to its municipal beneficiary), without designation of any particular purpose or purposes to which such property is to be devoted, "shall be construed as being intended for public improvementswithin such town or city." 60 O.S. 2001, § 392[60-392] (emphasis added). Title 60 O.S. 2001, § 395[60-395], as to the powers of co-trustees, authorizes and empowers such trustees to use money and property of the trust estate "for the construction of public improvements in the town or city."Id. (emphasis added). But this statute goes on to provide, "Such cotrustees shall be the exclusive judges of the public improvements to be made or aided from such trust estate." Id. Thus, there are indications of legislative intent that the activities of trusts with cities or towns as beneficiaries should be used for public improvements within the municipal beneficiary. *Page 11 
Oklahoma Constitution Article X, Section 27 authorizes cities and towns to issue bonds to purchase or construct municipal utilities, and OKLA. CONST. art. XVIII, § 6 broadly authorizes municipalities to engage in a wide variety of enterprises. While the term "public utility" has no fixed or precise meaning, it is synonymous with "public good or public use." See City of Shawnee v. Williamson, 338 P.2d 355, 358 (Okla. 1959). A "public utility" has been held to include such items as a municipal parking lot, a park, a sewer system, a fire station, an electric plant, a library, an airport, a water system, a museum, and even a cemetery.Id. However, despite dictum in an early case,[12] a school building isnot a municipal utility. See State ex rel. Grimes v. Bd. of Educ.,99 P.2d 876, 878-79 (Okla. 1940).
In the part of Opinion 00-26 highlighted above, it is made clear that the public trust must provide some benefit other than merely generating administrative fees from providing financing for a project by issuing revenue bonds. Id. at 122.
In Sublett v. City of Tulsa, 405 P.2d 185 (Okla. 1965), it was held that the power of a city to help finance construction of port and industrial park facilities in an area many miles from its municipal boundaries was based on the city's economic development powers under OKLA. CONST art. X, § 35, to benefit the city by encouraging development of industry "within or near" the city, thereby creating jobs and increased economic activity. Id. at 193.
It is exceedingly unlikely, perhaps almost impossible, that a person living in central or northwest Oklahoma would regularly work for or attend school in a school district more than 100 miles away. What possible benefit could accrue to the municipality that is beneficiary of such a trust providing financing for a school district so far away? Absent some justification under the Warram case, it would certainly appear at this juncture that the main (and perhaps only) reason such a municipal-beneficiary trust would issue revenue bonds for one or more school districts many counties and many miles away, is to generate fees for this service as reported in the Article.[13] *Page 12 
Whether the municipality in question has statutory or constitutional powers to engage in the kind of financing transactions described in theArticle is very doubtful. After diligent research, we are unable to locate any authority for a municipality to engage in transactions outside its municipal limits other than to "secur[e] or develop
industry within or near the municipality" (62 O.S. 2001, § 652[62-652]), to furnish water or other utility services to municipal residents (Sublett, 405 P.2d at 202-03), or accomplish other public purposes described in the Warram decision. See Warram, 285 P.2d at 1040-41. Under such circumstances, our conclusion is that a municipal-or county-beneficiary public trust functioning solely to generate fees from revenue bond issuances would fail the Warram test.
Other Attorney General Opinions and reported decisions support this conclusion. One such case, discussed in Opinion 00-26, is In reGoodwin, 597 P.2d 762 (Okla. 1979), where the Supreme Court held that the Cherokee County Home Finance Authority, a public trust with Cherokee County as beneficiary, was restricted in its financing activities to the geographical boundaries of the county. Id. at 767. In Goodwin, no economic development activities under OKLA. CONST. art. X, § 35 were invoked. The court held that the subject trust could not issue bonds to finance mortgage loans to low-to-moderate income families outside the beneficiary county. Id.
In Attorney General Opinion 81-30, the Attorney General concluded that an Oklahoma nonprofit housing development corporation chartered as an instrumentality of an Oklahoma public housing authority created under 63 O.S. 1971, §§ 1051[63-1051] — 1099, may not acquire land, issue obligations and generally do things necessary to develop housing outside the territorial limits of its parent entity public housing authority, because the parent authority lacked legal capacity to approve such activities. Id. at 59-60. While the public housing authority in Opinion 81-30 was created under Title 63, not as a classic Title 60 public trust, the Opinion nevertheless is an indication that the "parent" or beneficiary of an authority must at least have legal authority to function outside its geographic limits with respect to acquisition, development or operation of housing projects.
In Attorney General Opinion 79-168, the Attorney General indicated that the governmental beneficiary of a public trust may lease the beneficiary's property to the trust, which may in turn enter into an agreement with a private entity for use of the leased property as an economic or industrial development activity. Id. at 237 passim. But if the trust or the governmental beneficiary is left with only bare legal title, the private user should bear the burden of paying property tax on such property. Id. For this to happen, however, the governmental beneficiary must be expressly authorized and empowered to lease or otherwise use the property in this way.
Treatises on local government indicate generally that while municipalities may engage in endeavors outside their corporate limits, such activities must contribute to the welfare, health and public interest of their inhabitants, not primarily to further the interests of nonresidents, and such extraterritorial activities must be authorized by the Constitution or statute.[14] The McQuillin treatise, summarized in *Page 13 
the footnote, cites the Oklahoma case of City of Tulsa v. Williams,227 P. 876 (syllabus) (Okla. 1924), for the proposition that an Oklahoma municipality may acquire property outside city limits by condemnation for a water reservoir. Out-of-state citations in McQuillin for the proposition that a municipality may act outside its territorial boundaries when properly authorized by law include Provo City v.Ivie, 94 P.3d 206, 208 (Utah 2004) (furnishing utilities outside municipal boundaries), and City of Carbondale v. Van Natta,338 N.E.2d 19, 23 (Ill. 1975) (recognizing zoning authority beyond municipal limits).
In any event, Attorney General Opinion 00-26 makes clear there must be a clear rationale and legal authority for the beneficiary municipality or county to engage in the questioned enterprise, and merely reaping fees for issuing bonds with which to finance a building in a faraway county is not enough. What is "enough" involves fact questions that cannot be answered in an Attorney General Opinion. 74 O.S. 2001, § 18b[74-18b](A)(5).
Assuming the facts set out in the Article and your letter are accurate (which we have not undertaken to verify) we conclude that, except for: (1) economic development activities properly undertaken under OKLA. CONST. art. X, § 35, or (2) development, operation or financing of municipal utilities, or (3) other activities benefitting the trust beneficiary as required by the Warram case, a public trust with a municipality as beneficiary may not lawfully engage in transactions to finance school buildings or other facilities for school districts that are outside the boundaries of, and have no rational connection with, the municipality.
 It is, therefore, the Official Opinion of the Attorney General that:
 1. A school district may not lawfully pay interest on its lease-purchase obligations from the proceeds of bonds issued pursuant to OKLA. CONST. art. X, § 26, but must pay such interest from money available in the *Page 14 district's general fund or its capital improvement fund. See 70 O.S. 2001 Supp.2007, §§ 1-117; 5-158; A. G. Opins. 02-43; 02-14.
 2. A school district may not lawfully use proceeds of general obligation bonds to make an installment under a lease purchase agreement where the principal amount of the transaction is increased in lieu of interest, i.e., the lease includes no component for interest, but the principal amount is increased to compensate the lessor. A school district cannot do indirectly what it is prohibited from doing directly and such a structure would violate OKLA. CONST. art. X, § 26. A.G. Opin. 02-43; see Reherman v. Okla. Water Res. Bd., 679 P.2d 1296, 1301 (Okla. 1984).
 3. Except for economic development activities properly undertaken under OKLA. CONST. art. X, § 35, or in connection with development and operation of municipal utilities, or other activities justified under Board of County Commissioners v. Warram, 285 P.2d 1034, 1040 (Okla. 1955), a public trust with a municipality as its beneficiary may not lawfully operate outside the geographic boundaries of its municipal beneficiary. Thus, such a trust may not issue revenue bonds and use the proceeds in connection with a lease-purchase agreement with a school district outside the geographic boundaries of the beneficiary municipality except under the above-listed conditions. See 60 O.S. Supp.2007, § 176; In re Goodwin, 597 P.2d 762, 767 (Okla. 1979); A. G. Opins. 02-43; 00-26; 81-30.
W.A. DREW EDMONDSON ATTORNEY GENERAL OF OKLAHOMA
LYNN C. ROGERS ASSISTANT ATTORNEY GENERAL
[1] Tony Thornton Randy Ellis, "Nontraditional financing methods mean . . . School districts can build now, pay later," THE OKLAHOMAN, Aug. 12, 2007, at 1A [hereinafter Article].
[2] See A. G. Opin. 02-43, at 259 (describing a typical "lease-purchase" transactions by school districts).
[3] A general obligation bond of a school district is a bond to be repaid over a period of years from ad valorem tax revenues, issued pursuant to the Oklahoma Constitution Article X, Section 26(a), and applicable sections of the school code.
[4] See Article, at 4A, ¶ 3.
[5] Letter from Jeff A. McMahan, State Auditor Inspector, Oklahoma Office of the Auditor Inspector, to W.A. Drew Edmondson, Attorney General of Oklahoma (Oct. 23, 2007).
[6] See OKLA. CONST. art. VI, § 19; 74 O.S. 2001, §§ 212[74-212], 213 (describing duties of the State Auditor and Inspector, including the authority to conduct audits and special audits of school districts and other governmental subdivisions).
[7] See footnotes 1, 5 above.
[8] See 60 O.S. 2001 Supp.2007, §§ 176 — 180.4; Bd. of County Comm'rs v. Warram, 285 P.2d 1034, 1041 (Okla. 1955); Shipp v. Se. Okla. Indus. Auth., 498 P.2d 1395, 1398 (Okla. 1972); Morris v. City of Okla. City,299 P.2d 131, 136-38 (Okla. 1956); A. G. Opin. 04-20, at 124-27.
[9] See footnotes 1, 5. Annual audits are required of school districts (70 O.S. Supp.2007, § 22-103(A)), public trusts (60 O.S. Supp.2007, § 180.2(a)) and municipalities (11 O.S. Supp.2007, § 17-105(A), (B)), with copies to the State Auditor and Inspector, and, in the case of school districts, to the State Board of Education (70 O.S. 2001, § 22-108[70-22-108](A)).
[10] See footnote 1.
[11] It should be noted that Sections 381 — 396 of Title 60 deal withresulting trusts coming from gifts made to the State and political subdivisions, not with public trusts created under Sections 176 — 180.4.
[12] Cf. State ex rel. Manhattan Constr. v. Barnes, 97 P. 997, 1000
(Okla. 1908) (dictum) (including "schoolhouses" in a list of "public uses").
[13] See footnote 1. Although some situations might be hypothesized where school districts, municipalities and/or public trusts act jointly to accomplish some mutually beneficial goal, these situations are not described in the Article or the Opinion request, and thus are not dealt with in this Opinion. In any event, the Warram standard would still apply.
[14] See 56 AM. JUR. 2D Municipal Corporations §§ 181, 521 (Westlaw). As a general rule, the jurisdiction of municipal corporations ends at the municipal boundaries and does not extend beyond their municipal limits, in the absence of express legislative authority. Id. at § 521. Examples of public purposes for which municipalities have been held to have authority to buy property or construct projects outside municipal limits include lakes, waterworks, sanitary sewer plants, power generation and transmission facilities, airports and the like.
In the widely cited McQuillin, The Law of Municipal Corporations [hereinafter McQuillin], many sections discuss this topic, but citations to Oklahoma cases are sparse. McQuillin says the general rule is that the powers of a municipal corporation are limited by its boundaries and cannot be exercised outside them, absent some specific constitutional or statutory authorization. 2A McQuillin § 10:8. "Generally speaking, a municipality cannot engage in the real estate business" merely for speculation or profit, but may do so for a public or municipal purpose. 12 MCQUILLIN § 36:6. "[s]peculative dealing in real estate for investment purposes . . . is not among the usual powers bestowed on municipal corporations; nor does such power arise by implication from any of the ordinary powers conferred on municipal corporations[.]" Id. A municipal corporation may purchase or lease real property for corporate purposes, i.e., those purposes germane to the objects of the creation and existence of the municipality. 10 McQuillin §§ 28.05, 28.12. Such purposes may include parks, fire or police stations, utilities (water, gas, sewer, electricity, etc.) or other public works. "Generally, a municipal corporation may not expend public funds for improvements and construction outside its corporate limits, unless for a public purpose that is authorized by [the state constitution,] statute or charter." 13 MCQUILLIN § 37.11; see 12 MCQUILLIN § 35:18. *Page 1